FILED
2008 May-08  PM 01:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

FILED

2008 MAY -7  PM 12: 24
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| Estate of Jeffrey D. Ashley, by and through his guardian and best friends, Jerry and David Ashley, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CIVIL ACTION NO.: |
| Deputy Casey Thrower, individually; Trooper Bauman, individually; Sheriff Blake Dorning, individually; Major Roscoe Howell, individually; UNKNOWN OFFICERS AT SCENE, individually, to be added by amendment, when ascertained; | ) ) ) ) ) ) ) | CV-08-S-0803-NE |
| Defendants. | ) ) ) | JURY TRIAL DEMANDED |

## COMPLAINT

## I. JURISDICTION

1.  The jurisdiction of this court is invoked pursuant to the First, Fourth and Fourteenth Amendment of the United States Constitution.  This is an action brought pursuant to 42 U.S.C. Section 1983, et seq. and state law under this court's supplemental jurisdiction to recover civil damages arising from the violations of the First, Fourth and Fourteenth  Amendments to the U.S. Constitution and to the

1

comparable parts of the Alabama Constitution of 1901 and all Federal and State laws and supplemental jurisdiction.

II. PARTIES

2. Plaintiffs' decedent, was a citizen of the State of Tennessee and brings this lawsuit on behalf of his estate.  His estate is filed in Lincoln  County, Tennessee and an estate has been opened.

3. The defendants, as stated in the caption of the complaint, were at all times, state actors in the Northern District of Alabama, during the course of the incidents as more particularly described below, in that they used the power of the state to effectuate the wrongs as heretofore described.

III. FACTS OF THE CASE

5. Plaintiff's decedent, Jeffrey D. Ashley, a Down Syndrome young man, age approximately 42,  was delayed getting medical treatment and was pronounced dead on May 18, 2006, 12:05 P.M. as a result of the Constitutional violations set out below, or in the alternative, his chance of recovery was reduced as a result of the Constitutional violations.

6. At his parent's home in Elora, Tennessee, Jeffrey Ashley began lapsing into shortness of breath, but was not unconsciousness, nor had any loss of pulse or cessation of breathing; however, this was the second time (at least) where Jeffrey

2

had to be hospitalized for these symptoms and it had turned out to be related to congestive heart failure.   Jerry Ashley, his brother, was with him and at least once before had to drive him to the Huntsville Hospital.  Thus, Jerry was very aware of the emergency that he had on his hands with his brother.

7.  The first link in the "chain of survival" is to immediately call 911. Immediately when Jerry saw Jeffrey's symptoms, Jerry called his father's business office, on his cell at 10:22 A.M., while getting Jeffrey into the car, along with Jeffrey's care-giver,  or while just starting down the road toward the hospital, and talked to Cindy, his father's secretary and long time employee; upon Jerry's request, she called 911while Jerry was on his way from 407 Limestone Rd., Elora, Tennessee, to the Huntsville Hospital where Jeffrey had been taken before.  The approximate distance to the hospital was about 30 to 35 miles.  In the phone call, Cindy specifically told the dispatcher that Jerry Ashley was on his way to the hospital with his brother, who had just had a heart attack and that the dispatcher was to notify the authorities.

8.  The call was made to the 911 dispatcher in  Madison and the dispatcher took the call.  The serious medical condition was explained to the dispatcher and it was explained that they were in route with Jeffrey to the Huntsville hospital, that it was an emergency, that his flashers would be on, and as before, wanted an

3

Case 5:08-cv-00803-CLS   Document 1   Filed 05/08/08   Page 4 of 13

ambulance (EMS) to meet them as close to half way as possible to keep the
ambulance from driving away from the hospital and then backtracking to the
hospital. It was clear and concise that the whole purpose of meeting the ambulance
at a half-way point was to save time in getting to the hospital.

9. The dispatcher made the call to ambulance. Arrangements were made for
Jerry to meet the ambulance at Moore's Mill Rd. This was done when the EMS
ambulance called Jerry on his cell phone at 10:50 A.M. Jerry estimates he would
have gotten to Moore's Mill Road in a few minutes, no later than 10:54, and
probably earlier, without any interference from the police, at the time that the
arrangements were made.

However, right after receiving the call from the EMS and setting up the
meeting place, as Jerry stopped at a red light,  between his home and Moore's Mill
Road, Deputy Casey Thrower of Madison County pulled up beside him and told him
to pull over. Right before this, Deputy Casey Thrower had been several cars behind
Jerry--Jerry motioned him up to his car. And waited at the light. And asked Deputy
Thower to help him get Jeffrey to the ambulance.

Deputy Thrower already knew that Jerry was meeting the EMS at Moore's
Mill Road, which was but a few minutes away.

10. Jerry Ashley told Deputy Thrower that he just needed to get the

4

ambulance to get Jeffrey to the hospital because of his heart attack.  Deliberately indifferent to Jeffrey's medical life threatening emergency, Deputy Thrower repeatedly told Jerry Ashley to pull over.  That was all he would say.  Just "pull over."  And he repeated himself over and over again.  Jerry tried to convince him to let him go, but, he just keep repeating himself, "pull over."  The light turned green.

11.  Jerry did not pull over and drove forward toward the ambulance, but before he had gotten very far, less than a mile, there was now a State Trooper police road block up ahead and he had to pull over.  Deputy Thrower pulled up next to him and got out of the car.  And now, Trooper Bauman, of the Alabama State Troopers, also came up to the car.  Trooper Bauman had raised his gun and pointed it at Jerry Ashley.

12.  Trooper Bauman put the gun up besides Jerry's head.  The care-giver screamed out "they are going to shoot him."  Jerry was exited from the car.  Jerry was put down "hard" on the pavement by Deputy C. Thrower of Madison County and Trooper Bauman and handcuffed and put into the back of the police car.

By, then there more police, troopers, and deputies and gathered.  Jerry, from inside the police car,  watched Thrower and Bauman and many other police officers standing around for an entire 10 about minutes, doing nothing.  At the time that he was pulled over, Jeffrey was breathing and, thus, he had a pulse.  The police officers

5

did nothing.

13. The EMS did not reach the Jeffrey until about 11:04, a delay of approximately 10 minutes, taking into consideration that Jerry Ashley was but a few minutes away from the ambulance before he was pulled over.

14. According to the Huntsville hospital records, when the EMS finally arrived at the scene (11:04), the patient was in asystole and had no spontaneous respirations. They instituted standard ACLS protocol and had great difficulty intubating the patient. After multiple failed attempts, they used a combitube and the patient was brought to the hospital being bagged (BVM) and was blue.

15. The EMS reached the hospital at 11:25 A.M. There was a delay in reaching the hospital of another approximate 10 minutes, because the ambulance now had to back-track through the traffic caused by the road block.

16. Jeffrey was pronounced dead at 12.05 P.M. According to Dr. Patrick O'Hare, M.D. he stated that "it was felt with a greater than forty-five minute downtime at this time, with no *ventilation* during the entire period of time that the patient had little chance of a successful outcome and so the code was called at this time: 12:05 P.M."

17. Plaintiffs' decedent claims that Thrower and Bauman, the arresting officers, and all of the other officers who were standing around, were deliberately

6

indifferent to the serious medical needs of the decedent, in that, instead of rushing him or assisting him to the EMS's themselves, they, instead, let him sit in the backseat of Jerry's vehicle, while they put Jerry on the ground, handcuffed him and put him the back of the patrol car. Then, according to the EMS report, Jeffrey also ended up on the road and was on the ground when they arrived at 11:04, and no one was doing CPR–the EMS report is devoid of any mention of anyone performing CPR on Jeffrey at the time of their arrival.

18.   According to the EMS report, Jeffrey lost conscienceness approximately 10 minutes before they (EMS) arrived. That is the 10 minutes that Jeffrey was delayed by Officers Thrower and Bauman. If they had allowed Jerry to proceed or escorted him, then, it would have been just a few minutes to the EMS. Jeffrey was still conscience when Thower refused to let Jerry proceed.

When the EMS got there, their first attempt at emergency treatment (CPR) met with some success, however, in route to the hospital, Jeffrey remained asystole all the way to the hospital, in spite of continuous CPR.

19.   The officers knew that Jeffrey had just had a heart attack. They knew he had Down Syndrome. They knew his health was fragile. They knew he was in a serious medical emergency. They knew Jerry was driving with his flashers. They knew it was an emergency. They knew from  the dispatcher that arrangements had

7

been made for Jerry to meet the EMS as close as possible to the hospital and they knew that time was of the essence. Thower and Bauman were deliberately indifferent to Jeffrey's serious medical needs by pulling Jerry over, not assisting him to the ambulance.

20. In spite of this knowledge, they caused the delay of life saving medical treatment from trained EMS personnel and they caused the delay in getting Jeffrey to the hospital.

21. Plaintiff alleges that the delay was either the proximate cause of Jeffrey's death or was the proximate cause of greatly reducing his chance of survival.

22. Plaintiff alleges that at the time the car was pulled over, Jeffrey was still breathing, though, it was shallow, his breathing tube was open and air was going into his lungs. Plaintiff alleges that the EMS personnel were delayed in getting to Jeffrey and that no CPR was administered, and that they found him Arystole, and were unable to revive him.

IV.  LIABILITY UNDER SECTION 1983 FOR THE INDIVIDUAL DEPUTIES AND TROOPERS AND ALL UNKNOWN OFFICERS AT THE SCENE.

23. Plaintiff alleges that the defendant police officers, Thrower and Bauman, were deliberately indifferent to Jeffrey's serious medical needs in refusing the

plaintiff's decedent medial treatment that was readily available.   They were deliberately indifferent to Jeffrey's serious medical needs by exiting Jerry from the car, putting him "hard" on the ground, cuffing him and putting him in the back of the patrol car instead of assisting Jeffrey to the ambulance.

Given the flight risk of Jerry Ashley, that there was none, and any reasonable police officer would have known this, first Thower could  easily have escorted Jeffrey to the EMS, then, Thower or Bauman could have taken Jeffrey to the ambulance themselves.  Instead, they busied themselves arresting Jerry during a extreme medical emergency when every second counts.

It is clear that the plaintiff's decedent has demonstrated an objectively serious medical need, which both Thower and Bauman knew, for not only were they told so by the dispatcher, but by Jerry, the care-giver in the backseat and they also could see Jeffrey in the car, that he was suffering from a heart attack.

The response to the medical need of Jeffrey was to set up a roadblock, force Jerry to pull over, to pin him "hard" on the pavement, to cuff him and to put him in the back of the patrol car.

The plaintiff alleges that on two occasions the defendants were given an opportunity to provide immediate medical attention by escorting Jeffrey to the EMSs and on both occasions, they refused, being more intent on stopping and

arresting Jerry Ashley than providing adequate medical attention to Jeffrey.
Furthermore, there was no reason for rerouting the ambulance. The plan was set
into place by their own agent, the dispatcher, and conveyed over the radio. The
defendants took it upon themselves to change the plan, to delay medical treatment,
all for an unknown or, at best, obscure reason.

A police officer that acts for an unknown or obscure reason when faced with
a medical emergency, such as this one, is deliberately indifferent as a matter of law.

Accordingly, the plaintiff's decedent alleges that necessary medical treatment
was delayed to Jeffrey Ashley for a non-medical reason and thus deliberate
indifference on the part of the defendants has been shown, which proximately
caused his death or reduced his chance of survival.

WHEREFORE, PREMISES  CONSIDERED,  Plaintiff requests the
following relief:

Plaintiff requests damages for the wrongs as set out, including, but not
limited, pain and suffering, compensatory damages, mental distress, and punitive
damages for the wrongs committed against him, and/or any and all other damages
allowable under law for the injuries described above, as allowable under federal or
state law, or both, in an amount that a reasonable jury would state.

V.  1983 LIABILITY FOR SHERIFF BLAKE DOWNING AND MAJOR

10

ROSCOE HOWELL, INDIVIDUALLY

24.  Defendants Downing and Howell failure to adequately train its officers constituted a policy giving rise the aforesaid constituitional violation.  These individuals are individually liable to the plaintiff's decedent because the custom or policy they established resulted in the deliberate indifference to the plaintiff's decedent's rights.  Plaintiff alleges they had an improper policy or an absence of policy.  Plaintiff alleges that Downing and Howell failed to establish sufficient and appropriate procedures and policies regarding the situation as heretofore described.

Jerry Ashley called the Madison County dispatcher and made arrangements for him to drive to meet the EMS only to be arrested for speeding and having the medical treatment delayed as heretofore described.   Plaintiff alleges that Downing and Howell, either the formulated policies in effect, or allowed them to stand, that resulted in the violation of Jeffrey's constitutional rights.

Plaintiff alleges that Jerry followed SOP by calling the dispatcher and telling that person what he was going to do and that at no time did anyone tell him that he was not to proceed with his flashers toward the ambulance.

Plaintiff alleges that the actions of Officers Thower and Bauman, delaying the treatment for Jeffrey clearly shows deliberate indifference on their part, and/or deliberate indifference on the part of Downing and Howell, in not training them.

11

WHEREFORE, PREMISES  CONSIDERED,  Plaintiff requests the following relief:

Plaintiff requests damages for the wrongs as set out, including, but not limited, pain and suffering, compensatory damages, mental distress, and punitive damages for the wrongs committed against him, and/or any and all other damages allowable under law for the injuries described above, as allowable under federal or state law, or both, in an amount that a reasonable jury would state.

Respectfully Submitted,

Jeffrey W. Bennitt
ASB 0774 N51J
BEN004

**OF COUNSEL**
Jeffrey W. Bennitt & Associates, LLC
121 Edenton St.
Birmingham, AL 35242
phone: (205) 408-7240
fax: (205) 408-9236
e-mail: Bennittlaw@aol.com

**Plaintiff's Address**:

c/o Jeffrey W. Bennitt & Associates, L.L.C.

**Defendant's Addresses**:

Attorney wills serve at the following address:

12

Deputy Casey Thrower
Madison County Sheriff's Department
100 Northside Square
Huntsville, AL 35801

Sheriff Blake Dorning
Madison County Sheriff's Department
100 Northside Square
Huntsville, AL 35801

Trooper Bauman
301 S. Ripley St.
Montgomery, AL 36102

Major Roscoe Howell
301 S. Ripley St.
Montgomery, AL 36102

13