FILED

2009 Nov-30  PM 04:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MARGARET ASHLEY, as** | ) | |
| **personal representative of the** | ) | |
| **Estate of Jeffrey D. Ashley,** | ) | |
| **deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-08-S-803-NE** |
| | ) | |
| **DEPUTY CASEY THROWER;** | ) | |
| **and TROOPER BAUMAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This action is before the court on motions for summary judgment filed by

defendants, Madison County, Alabama, Deputy Sheriff Casey Thrower and Alabama

State Trooper Blake Baughman, seeking the dismissal of claims asserted pursuant to

42 U.S.C. § 1983 by Margaret Ashley, the personal representative of the Estate of

Jeffrey D. Ashley, deceased.  The suit arose from an incident that occurred on May

18, 2006, when defendants detained Jerry Ashley, the driver of an automobile

transporting plaintiff's decedent, who had suffered a heart attack, from his home in

Elora, Tennessee, to a location near Huntsville, Alabama, at which Jerry Ashley

expected to meet an ambulance.  The following claims are addressed in this opinion:

plaintiff's contention that defendants were deliberately indifferent to the serious

medical needs of Jeffrey Ashley, as demonstrated by those actions that delayed his receipt of emergency medical treatment and, allegedly, thereby caused his death; and, plaintiff's claim that defendant Baughman failed to intervene, to prevent defendant Thrower's constitutional violations.[1]   Following consideration of the pleadings, briefs, evidentiary submissions, and oral arguments, the court concludes that defendants are entitled to qualified immunity, and that plaintiff's federal claims must be dismissed.

## I.  STANDARDS OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[2]  In other

---

[1] Plaintiff failed to respond to defendants' well-supported arguments that summary judgment should be entered in their favor on plaintiff's "failure to rescue" claims.  *See* doc. no. 29 (amended complaint) at 8-9 (Count II – defendant Thrower) and 11-13 (Count IV – defendant Baughman). Further, her attorney did not address those contentions during oral argument.  As a result, plaintiff effectively abandoned those claims, and they will not be discussed further.  *See*, *e.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards.").

It should also be noted that plaintiff's original and amended complaints (*see* doc. nos. 1 and 29, respectively) included claims against Blake Dorning, the Sheriff of Madison County, Alabama, and Major Roscoe Howell of the Alabama State Troopers.  However, plaintiff's motion to dismiss those claims (doc. no. 39) was granted by the order entered on Feb. 17, 2009 as doc. no. 42.

[2] Rule 56 was amended in 2007, in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous text of Rule 56 are equally applicable to

words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

**A**.    *Construction of Facts Relevant to Qualified Immunity Defense*

The summary judgment requirement to review all evidence and indulge all reasonable inferences in favor of the party opposing summary judgment takes on even greater force when, as in the present case, law enforcement officers interpose the affirmative defense of "qualified immunity" to claims founded upon 42 U.S.C. § 1983.  In such cases, the court *normally* must answer the legal question of whether the officers are entitled to qualified immunity under *the plaintiff's* version of the facts. *See*, *e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider . . . this threshold question: *Taken in the light most favorable to the party asserting the injury*, do the facts alleged show the

---

the revised version.

officer's conduct violated a constitutional right?") (emphasis supplied).

This is not a normal case, however. Instead, there are audio and video recordings of material conversations and events. Consequently, when plaintiff's allegations differ from such evidence, this court will relate, and rely upon, the objective facts. *See*, *e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Beshers v. Harrison*, 495 F.3d 1260, 1262 n.1 (11th Cir. 2007) (refusing to adopt a plaintiff's version of facts when reviewing a district court's order granting summary judgment in favor of the defendant police officers on the issue of qualified immunity to an excessive force claim because the plaintiff's factual allegations were "clearly contradicted" by videotape evidence, "such that no reasonable jury could believe" the plaintiff's version of facts).

**B**.    *The Parties' Lack of Compliance With Court Requirements for Statements of Allegedly Undisputed Facts*

The brief submitted by defendant Casey Thrower in rebuttal of plaintiff's brief in opposition to summary judgment did not comply with the requirements of "Appendix II" to the Uniform Initial Order: *i.e.*, defendant Thrower did not respond, paragraph-by-paragraph, to plaintiff's statement of additional, allegedly-undisputed

4

facts.[3]  Further, defendant Blake Baughman failed altogether to file a rebuttal brief.

_____

[3] "Appendix II" to the Uniform Initial Order entered in this case on June 27, 2009 (doc. no. 15) addresses the requirements for briefs and evidentiary materials submitted either in support of or opposition to potentially dispositive motions, and contains the following requirements incumbent upon a party opposing a motion for summary judgment (here, the plaintiff) and a party replying to such opposition (defendants):

    **2.**    **Opposing Party's Statement of Facts**
Each party opposing a summary judgment motion also must submit a statement of facts divided as follows.

    . . . .

    **b.**    **Additional Undisputed Facts**
The second section may contain additional, allegedly undisputed facts set out in *separately numbered paragraphs* that the opposing party contends require the denial of summary judgment.  The second section of the opposing party's statement of facts, if any, shall be clearly designated as such.  The opposing party should include only facts which the opposing party contends are true and not in genuine dispute.

    **c.**    **Additional Disputed Facts**
The third section may contain additional, allegedly disputed facts set out in *separately numbered paragraphs* that the opposing party contends require the denial of summary judgment.  The third section of the opposing party's statement of facts, if any, shall be clearly designated as such.  Each statement of allegedly disputed facts must be followed by specific reference to those portions of the evidentiary record which both support and contradict the alleged fact.

    **3.**    **Moving Party's Reply**
The reply submission, if any, shall consist of only the moving party's disputes, if any, with the non-moving party's additional claimed disputed and undisputed facts.  The moving party's response to the non-moving party's additional claimed disputed and undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the non-moving party's additional claimed disputed and undisputed facts. Any statements of fact that are disputed by the moving party must be followed by a specific reference to those portions of the evidentiary record upon which the disputation is based.  All additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant.

    **The court reserves the right *sua sponte* to STRIKE any statements of fact or responsive statements that fail to comply with these requirements.**

Accordingly, all additional facts proposed by plaintiff could be deemed to have been admitted for summary judgment purposes — all, that is, except for those allegations that are contradicted by the video and audio recordings. Moreover, both plaintiff and defendant Thrower failed to comply completely with Appendix II of the Uniform Initial Order, and with the order entered on February 20, 2009, in which the court reminded the parties, in **boldface type**, that their "**briefs and evidentiary submissions *must* comply with the provisions of this court's Uniform Initial Order**."[4] The parties apparently did not view those clear directives as mandatory, but merely precatory suggestions. For all of the foregoing reasons, the parties' briefs could be stricken as a sanction for disregarding clear court directives. Even so, the court has determined that the interests of justice are best served by allowing the briefs to remain in the record, and by addressing the merits of the non-compliant arguments.

## II. SUMMARY OF FACTS

During May of 2006, Mrs. Billie Joyce Green worked in the Elora, Tennessee, home of Margaret and Davie Ashley three days each week, Tuesday through Thursday, from 9:00 in the morning until 5:00 in the afternoon.[5] Mrs. Green's duties

---

Doc. no. 15 (Uniform Initial Order), Appendix II, ¶¶ D(2) and D(3), at 16-18 (all emphasis in original).

[4] Doc. no. 50 (order entered on Feb. 20, 2009), at 2 (all emphasis in original).

[5] *See* doc. no. 52 ("Brief in Support of Deputy Thrower's Motion for Summary Judgment"), Ex. J (Deposition of Billie Green) (**hereafter, "Green Depo."**), at 14.

consisted of "sitting with" the Ashley's 42-year-old son, Jeffrey, who had been born with Down syndrome, and performing household chores for Mrs. Ashley.[6]   Mrs. Green arrived for work at her usual time on the morning of Thursday, May 18, 2006, and Margaret Ashley left the home shortly afterwards.[7]   Mrs. Green had been in the house "for a little while," working in the laundry room, when she first took notice of the fact that Jeffrey had not followed his usual routine of coming out and waving at her, "you know, just being friendly."[8]   When Mrs. Green checked on Jeffrey, she found him lying on his bed and "noticed that he was just kind of blue around his mouth."[9]   She immediately telephoned the office of the "Davie Ashley Sawmill," the family business, and told the office manager, Cindy Presley,[10] that Jeffrey was "having some problems," and that Presley needed to find his brothers, Jerry and

---

[6] *Id*. ("I sit with Jeff and . . . did work in her home.").

[7] *Id*. at 13 and 15.

[8] *Id*. at 17; *see also id*. at 15 ("[U]sually when he heard my voice he would always come . . . to see me or speak.").

[9] *Id*. at 17.  Later that morning, Mrs. Green told an emergency responder from the Moores Mill Volunteer Fire Department that Jeffrey Ashley had "aspirated at the house.  She told me he had been choking and started turning blue . . . ."  Doc. no. 61 ("Second Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment") (transcript of the audible audio from the recording device mounted on the dash of Deputy Thrower's patrol vehicle) (**hereafter**, "**Joint Ex. 3-T**"), at 27 (lines 2-4).

[10] Green Depo. at 17; *see also* doc. no. 52 ("Brief in Support of Deputy Thrower's Motion for Summary Judgment"), Ex. K (Deposition of Cindy Presley) (**hereafter**, "**Presley Depo**."), at 7-9.

Jarrett Ashley,[11] and tell them "to get there fast."[12]  The time was about 10:00 a.m.[13]

Jerry Ashley was working in a shop about 100 yards from his parents' home when he received Ms. Presley's telephone call.[14]  He immediately walked or ran to the house, and Mrs. Green estimated that he arrived less than five minutes after her telephone call to Cindy Presley.[15]  Jarrett Daren Ashley, the youngest brother, was in the mill yard about 300 yards from his parents' home when Cindy Presley contacted him by two-way radio.[16]  He does not remember whether he walked or drove to the house, but he arrived about three minutes after Jerry.[17]

When Jerry entered the bedroom, Jeffrey was conscious.[18]  Even so, Mrs. Green told Jerry that she "thought we needed to get Jeff ready . . . to take [him] to the hospital or go get some help."[19]  Jerry asked: "should we call the ambulance and wait

---

[11] Green Depo. at 15-16 (Mrs. Green explained that she had been instructed "to call the brothers from work" if anything happened with Jeffrey, because the brothers "worked right there close to the house"); *see also* Presley Depo. at 7.

[12] Green Depo. at 17 and 18 ("I told her . . . to call Jerry and tell him to get there as fast as he could.").

[13] Presley Depo. at 8.

[14] *See* doc. no. 52 ("Brief in Support of Deputy Thrower's Motion for Summary Judgment"), Ex. H (Deposition of Jerry Ashley) (**hereafter, "Ashley Depo."**), at 9.

[15] *See* Green Depo. at 18; *see also* Ashley Depo. at 9-10.

[16] *See* doc. no. 52 ("Brief in Support of Deputy Thrower's Motion for Summary Judgment"), Ex. I (Deposition of Jarrett Daren Ashley) (**hereafter, "J.D. Ashley Depo."**), at 7 ("I am 39."), and 10-11.

[17] *See id.* at 11-12; *see also* Green Depo. at 20.

[18] *See* Green Depo. at 19 ("Jeff reached out for [Jerry] to love him.  And, of course, he loved him.").

[19] *Id.*

8

for him [sic], or do you think — what should we do?," to which Mrs. Green responded "let's just get him in the car and meet the ambulance."[20]

Jeffrey "got up[,] . . . sat on the side of the bed," and Mrs. Green and the Ashley brothers "started putting his shoes on him to get him ready to take to the hospital."[21]  Jeffrey then walked to Jerry's automobile,[22] sat in the back seat, and Mrs. Green slid in beside him.[23]  Jerry instructed Jarrett "to get me an ambulance to [the] corner of Moores Mill and Winchester Road" northeast of Huntsville, Alabama,[24] and then drove away.

**A.**      *10:46:59 a.m.*[25]

---

[20] *Id.* at 21 ("That was my suggestion.").

[21] *Id.* at 19-20; *see also* Ashley Depo. at 11.

[22] *See* J.D. Ashley Depo. at 12 ("He walked out to the car himself.  We didn't have to carry him or anything like that.").  *But see* Green Depo. at 21 (Mrs. Green testified that Jarrett Ashley "helped us get him in the car").

[23] *See* Green Depo. at 23; Ashley Depo. at 13.

[24] Ashley Depo. at 12.

[25] All textual statements of time that include the hour, minute, and *second* that an event occurred (*e.g.*, "10:46:*59* a.m.") are based upon notations electronically "stamped" on audio recording media maintained by Huntsville Emergency Medical Services, Inc. ("HEMSI"), the Madison County Sheriff, and the dispatch center for Volunteer Fire Departments in Madison County, *or* on the audio and video recording media removed from the device mounted on the dash of Deputy Casey Thrower's patrol vehicle.  Note well, however, that there is no evidence indicating that the devices electronically imprinting time notations on the foregoing recording media were calibrated to a common source.  That makes it difficult to state the precise time of relevant events.

For example, there was a temporal disparity of approximately one minute and 10 to 13 seconds between the electronic time notations imprinted on audio tapes maintained by the Madison County Sheriff's dispatch center and the recording media removed from the device mounted on the dash of Deputy Thrower's patrol vehicle.  *Compare, e.g.*, doc. no. 61 ("Second Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment"), Joint Ex. 2-T (revised transcript of recorded radio traffic between, among others, Deputy Thrower and Madison County Sheriff's dispatch operators), at 2 (lines 14-17)

9

The exact time at which Jerry Ashley departed his parents' home is not known. He testified that he did so "very close to 10:40."[26] That appears to be a fairly accurate estimate, in view of the fact that a telephone call from Cindy Presley to an ambulance dispatch operator after Jerry's departure[27] was automatically recorded, beginning at 10:46:59 a.m.[28] The transcript of the conversation between Ms. Presley and an employee of Huntsville Emergency Medical Services, Inc. ("HEMSI") named Nicholas Adam Goodman reads as follows:

Goodman:   Ambulance service.  Nick.

(recording the following statement as occurring at or near **10:56:16**: "get a 10-58 at Winchester and . . . Moore's Mill.  He says he's got a subject dying in the back seat and refuses to pull over."), *with id.*, Joint Ex. 3-T (transcript of the audible audio from the recording device mounted on the dash of Deputy Thrower's patrol vehicle), at 2 (lines 5-8) (*recording the same statement as occurring at* **10:57:29**).

Consequently, *when the precise time differential between events was of critical importance — i.e.*, when determining the length of the delay in Jeffrey Ashley's receipt of medical attention worked by those actions of defendants discussed in Part III *infra — this court relied upon the same evidentiary source*:  the digital timing device integrated into the electronic circuitry of the audio and video recording equipment mounted on the dash of Deputy Thrower's patrol vehicle: see Part II(R) of this opinion *infra*, discussing "The Length of the Delay."

[26] Doc. no. 40 ("Plaintiff's Exhibit List"), Ex. A (Feb. 15, 2009 affidavit of Jerry Ashley) (**hereafter**, "**First Ashley Affidavit**") ¶ 4 (2d sent.).

[27] Even though the Ashley home had a working telephone and Jerry Ashley possessed a cellular telephone, neither Jerry nor Jarrett used either telephone to call an ambulance.  Instead, after being instructed by Jerry Ashley "to get me an ambulance to [the] corner of Moores Mill and Winchester Road" northeast of Huntsville (*see* Ashley Depo. at 12), Jarrett walked to the office of the "Davie Ashley Sawmill" and instructed Cindy Presley to make that telephone call.  *See* J.D. Ashley Depo. at 13-14; Presley Depo. at 8; Green Depo. at 21-22.

[28] *See* doc. no. 59 ("Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment"), Joint Ex. 7 (recording of conversation between Cindy Presley and Nick Goodman and, subsequently, between Goodman and Jerry Ashley); *see also* doc. no. 63 ("Third Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment"), Joint Ex. 7-T (transcript of conversation) (**hereafter**, "**Joint Ex. 7-T**").

10

Presley:        Yes.  We're transporting someone to Huntsville Hospital
                and we need someone to meet us on Winchester Road,
                because we're afraid the patient will need assistance before
                he reache[s] the hospital.

Goodman:        Okay.  Where are you at now?

Presley:        Well, I'm not with them, but I can give you the cell phone
                of the person who's with them.

Goodman:        Okay.  Go ahead.

Presley:        Be (931) 607-7259.

Goodman:        7259.

Presley:        And he'll be in a white Lincoln Town Car.  His name is
                Jerry.

Goodman:        Is he by himself?

Presley:        No.  He has — that's the driver.  He has his brother with
                him.  He's a Downs syndrome patient.  And he has serious
                heart problems.  And he's having difficulty breathing.

Goodman:        Okay.  I will have an ambulance — I'll call and see where
                they're at and I'll get somebody on the way.

Presley:        Thank you so much.[29]

**B**.  *10:50:32 a.m.*

HEMSI dispatch operator Nick Goodman placed three calls to Jerry Ashley's

cell telephone number, but the first two (placed at 10:47:58 and 10:48:42 a.m.,

---

[29] Joint Ex. 7-T at 1-2.

respectively) were not successful:  both were funneled to Ashley's voice mail box.[30]
Goodman finally reached Ashley on the third attempt.   During the ensuing
conversation Goodman agreed to dispatch an ambulance to the "Rocket City Quick
Stop" convenience store located at the corner of Winchester and Moores Mill Roads
in Madison County, Alabama, northeast of Huntsville.  The following transcript of
that conversation commences with a dial tone at 10:52:32 a.m., according to the time
electronically "stamped" on the HEMSI recording:

>(Dial tone.)
>
>(Number dialed.)
>
>(Phone ringing.)
>
>JERRY ASHLEY:  Hello?
>
>GOODMAN:   Hi.   This is NICK GOODMAN with HEMSI Ambulance Service.
>
>ASHLEY:  Yes, sir.
>
>GOODMAN:   Hi.   Someone just called and said you that you were transporting a patient to Huntsville Hospital?
>
>ASHLEY:  Yes, sir.  I'm in New Market right now.
>
>GOODMAN:  Okay.  Where do you want me to come meet you at?

---

[30] *See id*. at 2 (lines 3-10) (10:47:58 call:  a recorded female voice states "You've reached 607-7259. Jerry Ashley.  At the tone, please leave your message and Jerry will return your call. Thank you."), and *id*. (lines 13-18) (10:48:42 call aborted by Goodman as soon as voice mail picked up).

ASHLEY:  Where are you at now?

GOODMAN:  I've got — I mean, I just need to know — I just need you to pick a place to stop somewhere.

ASHLEY:  I'm coming up Winchester Road.

GOODMAN:  Okay.  I need you to pick a place and stop somewhere and tell me where you are and I will send an ambulance to you.

ASHLEY:  Okay.  I don't know if I need to stop or not.

GOODMAN:  I can't come get you if you don't tell me where you are.

ASHLEY:  If you're on Winchester Road in the next little bit, if not, by the time I stop and wait on you, I'll be at the hospital.  I mean, he needs medical attention right now.

GOODMAN:  What's wrong with him, sir?

ASHLEY:  I ain't sure he ain't having heart failure.

GOODMAN:  Okay.

ASHLEY:  He's Downs syndrome and he has a heart condition, and he's real —

GOODMAN:  Okay.  There are EMT's close by.  I just need you to pick somewhere and stop and tell me where you are and I will get you medical attention.

ASHLEY:  Can you meet me at the corner of Moores Mill Road?

GOODMAN:  Moores Mill and Winchester?

ASHLEY:  Yes.

13

GOODMAN:  Yes, sir.  I can absolutely do that.  There's — let's see.  There's a gas station on three of the corners.

ASHLEY:  There's a Texaco on that left right there.

GOODMAN:  Do what?

ASHLEY:  A Texaco on that left right there.  It's a Robbie's Quick Stop or something on that left.  When I come to it, I usually turn left and go out Moores Mill and go to Huntsville Hospital, so . . .

GOODMAN:  Okay.  And what are you driving, sir?

ASHLEY:  I'm driving a tan Lincoln.

GOODMAN:  A tan Lincoln?

ASHLEY:  Yeah.  A Lincoln Town Car, an '06.

GOODMAN:  Can you tell me a phone number you're calling me from so in case —

ASHLEY:  (931) 607-7259.

GOODMAN:  Okay.  And you think he's having trouble breathing?

ASHLEY:  Yeah.  But I ain't sure something ain't happening to him right now.

GOODMAN:  How old is he?

ASHLEY:  Jeff is 42, maybe.

GOODMAN:  Is he conscious right now?

ASHLEY:  Just barely.  (Inaudible.)  Is he still breathing?  Keep where you can hear in his ear (inaudible).

14

GOODMAN:  Is he able to talk to you?

ASHLEY:  No.  He's Downs.  I mean, he can communicate, but cannot exactly speak.

GOODMAN:  Okay.  Did he choke —

ASHLEY:  Is he still breathing?  Put your ear up to his mouth.  Do you hear air?[31]  (Inaudible) chest.

GOODMAN:  Is he completely alert?

ASHLEY:  Huh?

GOODMAN:  Is he alert?  Does he seem to know what's going on?

ASHLEY:  He's still breathing.  I can't do this and drive.  Just meet me, please.

GOODMAN:  Okay.

ASHLEY:  Thank you.

GOODMAN:  Do you want me to stay on the line with you until we get there?

(End of CD.)[32]

According to Jerry Ashley's first affidavit, "Jeffrey lost consciousness" toward

---

[31] *See* Green Depo. at 29 (where Mrs. Green testified that she followed Jerry Ashley's instruction and, after placing her ear close to Jeffrey's mouth, she "could hear him breathing," and that she "told [Jerry] he was breathing").

[32] Doc. no. 61 ("Second Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment"), Joint Ex. 1-T (revised transcript of telephone conversation between Cindy Presley and HEMSI dispatch operator Nick Goodman, and, subsequently, between Goodman and Jerry Ashley), at 2-6.

the end of the foregoing telephone conversation and, at the point marked by footnote number 31 *supra*, Jerry instructed Mrs. Green "to put her ear to Jeffrey's mouth and to listen for breathing.  She did and told me that he was still breathing."[33]

**C.**     *10:52:53 a.m.*

Nicholas Goodman directed Paramedic David Brown and Emergency Medical Technician ("EMT") Scott Pickens to proceed from HEMSI's Medic Station No. 5 (located at the intersection of Winchester Road and North Memorial Parkway in Huntsville) to the intersection of Winchester with Moores Mill Road.[34]  At about the same time, an alarm was sent to the Madison County Volunteer Fire Department call

---

[33] First Ashley Affidavit ¶ 9; *see also supra* note 31 and accompanying text.

[34] *See* doc. no. 63 ("Third Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment"), Joint Ex. 8-T (transcript of the main HEMSI audio CD recording) (**hereinafter**, "**Joint Ex. 8-T**") at 1 (lines 2-6) ("Medic 5, need you in route.  Medical call Moores Mill Road, Winchester Road.").  The initial direction from HEMSI dispatch to Paramedic David Brown and EMT Scott Pickens was elaborated a little over a minute later, in a radio transmission that began at 10:54:12 a.m., reading as follows:  "DISPATCH: Medic 5, you are in route to Moores Mill Road, Winchester Road.  Responding to 42-year-old male with difficulty breathing.  The Patient's going to be at the Rocket City Quick Stop at Winchester and Moores Mill.  Run number is 17248."  *Id.* at 1 (lines 11-15).  *See also* doc. no. 59 ("Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment"), Joint Ex. 11 (Sept. 29, 2009 affidavit of David Earl Brown) (**hereafter**, "**Second Brown Affidavit**") ¶¶ 3-4 ("At approximately 10:52 a.m., on May 18, 2006, EMT Scott Pickens and I received a call from HEMSI dispatch requesting us to respond to the Rocket City Quick Stop at Winchester Road and Moores Mill Road.  Scott Pickens and I were at HEMSI Station No. 5, which is located at Winchester Road and Memorial Parkway when we received the call.").

center,[35] and a Moores Mill Volunteer Fire unit was dispatched to the same location.[36]

**D**.    *10:53:44 a.m.*

Madison County Deputy Sheriff Casey Thrower was working a "Click It or Ticket" traffic enforcement detail just off Winchester Road when he observed Jerry Ashley's vehicle.  He transmitted a call to the Sheriff's dispatch center at 10:53:44 a.m., stating that he was attempting "to catch up with a vehicle eastbound on Winchester at a high rate of speed with his flashers on."[37]  An audio and video recording device mounted on the dash of Deputy Thrower's patrol vehicle filmed the ensuing chase.  The device automatically began to record when the patrol vehicle's emergency lights were activated,[38] and the Ashley automobile was first viewed at

---

[35] *See* doc. no. 59 ("Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment"), Joint Ex. 6 (Madison County Volunteer Fire Department documents and records of the events that occurred on May 18, 2006), at the first document (showing "Alarm" given at 10:52:20) (Joint Ex. 6 is not consecutively paginated).

[36] *See* doc. no. 63 ("Third Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment"), Joint Ex. 10-T (transcript of the audio recording of the Madison County Volunteer Fire Department's dispatch transmissions), at 1 (lines 1-5) (dispatch communication commencing at 10:52:22).

[37] Doc. no. 61 ("Second Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment"), Joint Ex. 2-T (revised transcript of recorded radio traffic between, among others, Deputy Thrower and Madison County Sheriff's dispatch operators), at 1 (lines 9-11); *see also* Joint Ex. 3-T at 14 (lines 1-5) (where Thrower states: "I don't know where he was coming from.  I was sitting up there at New Market.  I just got done stopping a car and turned around.  He came by me like a shot with his flashers.  He was flying."); doc. no. 52 ("Brief in Support of Deputy Thrower's Motion for Summary Judgment"), Ex. D (April 24, 2009 affidavit of Casey Ryan Thrower) (**hereafter**, "**Third Thrower Affidavit**") ¶¶ 1-3.

[38] *See* doc. no. 41 ("Supplemental Evidentiary Submission in Support of Defendants Casey Thrower and Blake Dorning's Motion to Dismiss, Motion to Strike, or, in the Alternative, Motion for Summary Judgment"), Ex. A (Feb. 9, 2009 affidavit of Casey Ryan Thrower) (**hereafter**, "**Second Thrower Affidavit**") ¶ 4; *see also* doc. no. 60 ("Unopposed Motion to Substitute DVD

10:55:17, according to the time electronically stamped on the recording removed from the device.[39]  The video clearly shows Jerry Ashley's vehicle weaving in and out of traffic and crossing into the northbound lane.  The posted speed limit on Winchester is 55 miles an hour,[40] except for the school zones around Buckhorn High and Riverton Elementary Schools, where the speed limit drops to 25 miles an hour.[41]  Jerry Ashley testified that he *averaged* 65 to 70 miles an hour while driving to meet the ambulance, with an estimated top speed of 80 miles an hour.[42]

**E.**   *10:57:18 a.m.*

Deputy Thrower momentarily caught up with Jerry Ashley's automobile at the traffic signal governing the intersection of Winchester Road with Bell Factory Road, where he ordered Ashley to "Pull over!"[43]  Ashley refused to obey the order, saying "I've got a man dying in the back seat, my brother."[44]

---

Video Recording"), Joint Ex. 3 (video recording taken from the camera mounted on the dash of Deputy Thrower's cruiser).

[39] *See* Joint Ex. 3-T at 1 (lines 2-3) ("10:55:17 (Ashley vehicle visible.)").

[40] *See* doc. no. 32 ("Table of Contents of Evidentiary Materials in Support of Motion to Dismiss, Motion to Strike, or, in the Alternative, Motion for Summary Judgment"), Ex. E (Affidavit of David Pope), ¶ 3.

[41] *Id.* ¶ 4.

[42] *See* First Ashley Affidavit ¶ 4 ("I was driving at a safe speed, although there was one stretch when I drove up to 80 miles an hour, when there were no cars around.") and ¶ 11 ("I had to be averaging about 65 - 70 [miles an hour].").

[43] Joint Ex. 3-T at 1 (line 19).

[44]*Id.* at 1 (lines 23-24); *see also* Green Depo. at 32 (testifying that Ashley told Deputy Thrower "I'm not pulling over.  My brother's dying in the back seat."). Jerry Ashley later testified that he "tried to get him [*i.e.*, Deputy Thrower] to help me up to my ambulance," but Thrower exhibited no signs of being "willing to help me, so I just went on when the light changed." Ashley

Ashley's statement, made at 10:57:20 a.m. according to the time recorded by Deputy Thrower's dash-mounted device, was Thrower's first knowledge that a person in the Ashley vehicle had medical problems.[45]  Just nine seconds later (10:57:29), Thrower transmitted a direction for the Sheriff's dispatcher to send an ambulance to the intersection of Winchester and Moores Mill Roads:  "Get a 10-58 [*code directive for dispatch to send an ambulance*] at Winchester . . . and Moores Mill.  He says he's got a subject dying in the back seat and he refuses to pull over."[46]

Jerry Ashley continued to drive along Winchester Road past Riverton Elementary School, where he swerved to the right, to avoid a collision with a Coca-Cola delivery truck on the highway ahead of him.[47]

In the meantime, Alabama State Trooper Blake Baughman had become aware of Deputy Thrower's pursuit of Jerry Ashley's automobile by listening to radio traffic between Thrower and the Madison County Sheriff's dispatch center.[48]  Baughman

---

Depo. at 19-20.  Those assertions are not supported by the objective evidence, however.  *See* Joint Ex. 3-T at 1-2.

[45] *See* Third Thrower Affidavit ¶ 4; Joint Ex. 3-T at 1.

[46] Joint Ex. 3-T at 2 (lines 5-8).  *See also* doc. no. 32 ("Table of Contents of Evidentiary Materials in Support of Motion to Dismiss, Motion to Strike, or, in the Alternative, Motion for Summary Judgment Filed Contemporaneously Herewith"), Ex. D (Sept. 23, 2008 Affidavit of Deputy Casey Thrower) (**hereafter**, "**First Thrower Affidavit**") ¶ 16 (4th sent.) ("I radioed for medical units to respond to our area."); Second Thrower Affidavit ¶ 4 (5th sent.) (same).

[47] *See* Third Thrower Affidavit ¶ 5.  *See also* Joint Ex. 3, at time-stamp 10:57:58 a.m.

[48] *See* doc. no. 54 ("Memorandum Brief in Support of Trooper Blake Baughman's Motion for Summary Judgment"), Ex. L (Affidavit of Blake Baughman) (**hereafter**, "**Baughman Affidavit**") ¶ 3; *see also* doc. no. 61 ("Second Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment"), Joint Ex. 2-T (revised

placed a radio call to Deputy Thrower at 10:57:45, asking: "235, are you still after him?" Thrower replied: "10-4. He's — he refuses to stop."[49]  Trooper Baughman then set-up spike strips across the westbound lane of Winchester Road near its intersection with Riverton Road, and drew his service revolver, pointing it at Ashley's oncoming automobile.[50]

**F**.    *10:58:07 a.m.*

Jerry Ashley's vehicle came to a halt at Trooper Baughman's roadblock at 10:58:07 a.m.[51]  The stop occurred just three miles east of the location at which Ashley intended to meet the ambulance.[52]  When Ashley exited his automobile he was ordered to the ground by Trooper Baughman and handcuffed.[53]  According to Mrs.

---

transcript of recorded radio traffic between, among others, Deputy Thrower and Madison County Sheriff's dispatch operators) (**hereafter**, "**Joint Ex. 2-T**"), at 1 (lines 18-19) (where Trooper Baughman interjects himself into the flow of radio traffic, saying: "B224 to 47. I'm at Riverton Road and Winchester.").

[49] Joint Ex. 2-T at 2 (lines 19-21); Joint Ex. 3-T at 2 (lines 13-18) (same).

[50] *See* Baughman Affidavit ¶ 5; *see also* First Thrower Affidavit ¶ 16 (5th sent.) ("I was advised by Dispatch that an Alabama State Trooper was setting up spike strips at the intersection of Winchester Road and Riverton Road."); First Ashley Affidavit ¶ 13 ("He was standing with his gun drawn pointing at the car."); Green Depo. at 32 ("I seen this policeman standing with his gun pointed down at the car.").

*Compare Boyle v. City of Liberty, Mo.*, 833 F. Supp. 1436, 1450 (W.D. Mo. 1993) ("There is no question that police officers have the power to set up roadblocks in a reasonable manner for the apprehension of fleeing violators."), *with* Joint Ex. 3-T, at 20 (lines 3-6) (where Trooper Baughman was recorded on Deputy Thrower's dash-mounted device as saying he was prepared to shoot Jerry Ashley: "I was fixin' to cap him, but . . . he stopped.").

[51] *Id*. at 2 (lines 20-22); *see also* Ashley Depo. at 21.

[52] The parties stipulated during oral argument that the location of the roadblock was approximately *three miles* east of the place at which Jerry Ashley had arranged to meet the HEMSI ambulance.  *See* Transcript of Sept. 11, 2009 oral arguments, at 37-38.

[53] *See* Joint Ex. 3-T at 3 (lines 5-6) (where Baughman is recorded as saying: "Now, y'all get

Green, both officers "were so angry and hostile."[54]   Jerry Ashley testified that he asked the officers to allow Mrs. Green to continue driving his automobile to the ambulance, but "all [he] got was, shut up."[55]   However, the first words uttered by Deputy Thrower (and recorded at 10:58:11) were:  "Let me get an ambulance over here before you kill somebody."[56]

G.     *10:58:18 a.m.*

At 10:58:18 a.m., just seconds after Jerry Ashley stopped his automobile at Trooper Baughman's roadblock, Deputy Thrower again made radio contact with the Sheriff's dispatch center to provide emergency responders their exact location:  "47 [*code for Dispatch*].  Get me a 10-58 [*code directive for dispatch operator to send an ambulance*] at Riverton Road and Winchester."[57]

H.     *10:58:37 a.m.*

At 10:58:37 a.m. — 30 seconds after the stop — Deputy Thrower opened the

---

on the ground."); *see also* Baughman Affidavit ¶ 9.

[54] Doc. no. 40 ("Plaintiff's Exhibit List"), Ex. C (Feb. 12, 2009 affidavit of Mrs. Billie Green) (**hereafter**, "**Green Affidavit**") ¶ 15.

[55] Ashley Depo. at 31 ("I tried to be up front with them and tell them that Jeff . . . needed to get to an ambulance and if they wouldn't let me go, if they would let the caregiver drive him the rest of the way.  And all I got was, shut up."); *see also* Green Depo. at 38; Green Affidavit ¶ 10.  *Nota bene*:  Neither Jerry Ashley's alleged request for Mrs. Green to drive his car, nor the "shut up" response, was recorded by Deputy Thrower's dash-mounted device.

[56] Joint Ex. 3-T at 2-3.

[57] *Id.* at 3 (lines 9-10) (recorded at 10:58:18); *but see* Joint Ex. 2-T at 2 (lines 24-25) (same statement recorded at 10:57:10).

rear door of the Ashley vehicle and began assessing Jeffrey's condition.[58]  This was

the first time Deputy Thrower had any specific, personal knowledge of Jeffrey

Ashley's medical condition.[59]  Thrower asked Mrs. Green, "Is he breathing?," and she

responded:  "I don't know.  I don't think he is right now.  I am not sure."[60]

**I.**     *10:58:38 – 53 a.m.*

The following colloquy between defendants and Jerry Ashley was recorded by

Deputy Thrower's dash-mounted device during the 15 seconds following 10:58:38:

> JERRY ASHLEY:  Officer, I'm about a mile from my ambulance meeting me.

> TROOPER BAUGHMAN:  That's fine.  You just sit right here.

> DEPUTY THROWER:  What is his — what's wrong with him medically?

> JERRY ASHLEY:  He's got a heart condition.  Congestive heart failure, mister.

> DEPUTY THROWER:  Well, you almost killed two people going down the road.

---

[58] *See* Third Thrower Affidavit ¶ 7.

[59] *Id.* ¶¶ 4 and 7.

[60] Joint Ex. 3-T at 3 (lines 21-25).  *But see* Green Depo. at 34 ("I don't remember making that statement.").  Mrs. Green later testified that Deputy Thrower then placed his hand under Jeffrey Ashley's nose and mouth and stated that he "was breathing."  Green Depo. at 34 ("All I remember [is] him [Deputy Thrower] doing something with his hand and he told me that Jeff was breathing. And that's all that was done.").  Note well, however, that *if* such a statement was made by Deputy Thrower, it was not captured on the recording device mounted on the dash of his patrol vehicle, as were those statements quoted in the text preceding this marginal note.

22

JERRY ASHLEY:  Whatever.[61]

**J**.    *10:59 a.m.*

At approximately 10:59 Deputy Thrower checked to see whether Jeffrey Ashley had a pulse (he did not) and whether he was conscious (he was not).  Instead, according to Thrower, Ashley's pupils were fixed and glazed over, his hands were cold and clammy, vomit was visible in his nose and mouth, his body exhibited signs of discoloration, and he appeared "lifeless, and exhibited signs consistent with death."[62]   For those reasons, Deputy Thrower obtained a "portable Heart Start Defibrillator" from his patrol vehicle.[63]

**K**.    *10:59:06 a.m.*

Before returning to the Ashley vehicle, however, Thrower placed another radio transmission to the Sheriff's dispatch center, to reinforce the seriousness of the situation by instructing dispatch:  "Tell them [*the emergency responders*] Code 3 [*a protocol instructing an emergency vehicle to respond as fast as traffic will permit, using lights and siren*].[64]

---

[61] Joint Ex. 3-T at 4 (lines 2-23) (time notations omitted).

[62] Third Thrower Affidavit ¶ 7.

[63] *Id.* ¶ 8.  A defibrillator is "an electronic apparatus used to counteract atrial or ventricular fibrillation by the application of brief electroshock to the heart, either directly or through electrodes placed on the chest wall."  *Dorland's Illustrated Medical Dictionary* 480 (Douglas M. Anderson *et al*. ed., 30th ed. 2003).

[64] Joint Ex. 3-T at 5 (line 8); *see also* Second Brown Affidavit ¶ 10.

23

**L**.   *10:59:10 a.m.*

Paramedic David Brown and EMT Scott Pickens were redirected from the Rocket City Quick Stop to the intersection of Riverton Road with Winchester at 10:59:10 a.m., according to the time electronically stamped on the recording of the radio transmission from HEMSI dispatch to "Medic 5":

> DISPATCH:   Medic 5, I need you in route to Riverton and Winchester.
>
> HEMSI:  Medic 5, (inaudible) cancel first call [?]
>
> DISPATCH:  Medic 5, it's going to be the same call.  47 has this subject stopped at Riverton and Winchester.
>
> HEMSI:  10-4.  Thank you.[65]

**M**.   *10:59:29 — 11:02:54 a.m.*

At various times over the course of the next three and a half minutes, the computer-generated "voice" of Deputy Thrower's "portable Heart Start Defibrillator" can be heard on the recording removed from the device mounted on the dash of his patrol vehicle, stating the instrument's analysis of Jeffrey Ashley's heart rhythms, and instructing Deputy Thrower on the proper procedures for operating the device.[66]  The

---

[65] Joint Ex. 8-T at 1, lines 17-25.  Note well, however, that Paramedic David Brown's affidavit states that he received that instruction nearly three minutes later:  "At approximately 11:02:57 a.m., no more than thirty (30) seconds after Scott Pickens and I arrived at the Rocket City Quick Stop, HEMSI Dispatch advised me and Scott Pickens to respond to Riverton Road and Winchester Road."  Second Brown Affidavit ¶ 8.

[66] Undoubtedly, the portable unit carried in Deputy Thrower's patrol vehicle was a version of the device usually referred to as an AED ("automated external defibrillator").  *See Dorland's*

following transcript begins at 10:59:29, and ends at 11:02:54 a.m.

> DEFIBRILLATOR:  Press pads firmly to patient's bare skin.  Be sure the pads' connector is completely inserted.  Stay clear of patient.

> DEPUTY THROWER [*apparently speaking to Mrs. Green*]: Don't touch him.  Don't touch him.

> DEFIBRILLATOR:  Analyzing heart rhythm.  Stay clear of patient.

> DEPUTY THROWER:  Don't touch him.

> DEFIBRILLATOR:  Analyzing heart.  No shock advised.  Be sure emergency medical services have been called.  It is safe to touch the patient.

> DEPUTY THROWER:  Okay.  He's got a heartbeat,[67] so just hold on, okay?

> DEFIBRILLATOR:  Check circulation.  If needed, begin CPR. For help with CPR, press the flashing blue button.[68]

> . . . .

> DEFIBRILLATOR:  15 seconds until analysis will resume.

---

*Illustrated Medical Dictionary* 34 (Douglas M. Anderson *et al*. ed., 30th ed. 2003).

[67] The accuracy of Deputy Thrower's statement that "He's got a heartbeat" (apparently made because the portable defibrillator stated that "No shock [was] advised") may be subject to question: *see*, *e.g.*, Second Brown Affidavit ¶ 22 (where HEMSI Paramedic David Brown testified that, "[b]ased upon [his] medical experience and education as a State of Alabama licensed paramedic, when a defibrillator or AED advises the user to not shock a patient, the patient usually does not have a heartbeat rhythm that can be restarted by an AED or defibrillator."

[68] Deputy Thrower testified that he was unable to perform CPR on Jeffrey Ashley because there was not sufficient room in the back seat of the automobile to do so, and he was unable without assistance to remove Ashley from the backseat of the car "due to his size and weight."  *See* Third Thrower Affidavit ¶ 8.  *See also* Green Depo. at 15 (testifying that Jeffrey Ashley was between 5' 9'' and 5' 11'' in height, and weighed over 250 pounds).

25

. . . .

DEFIBRILLATOR:   Stay clear of patient.   Analyzing heart rhythm.

. . . .

DEPUTY THROWER: My God.  That kid — that kid's dead.  I just put the thing on him.  He —

DEFIBRILLATOR:  For help with CPR, press the flashing blue button.

. . . .

DEPUTY THROWER:  What's the ETA to HEMSI?

DISPATCHER:  23.

DEFIBRILLATOR:  30 seconds until analysis will resume.

. . . .

DEPUTY THROWER:  I wish they'd hurry up.

(Inaudible.)

DEPUTY THROWER:  He was probably dead when they were riding through here.

DEFIBRILLATOR:  Analyzing heart.  No shock advised.  It is safe to touch the patient.[69]

Trooper Baughman did not assist at any point during Deputy Thrower's

performance of the foregoing procedures because, according to Baughman, he was

_____

[69] Joint Ex. 3-T at 5-10 (time notations omitted).

not trained in the current techniques of cardiopulmonary resuscitation ("CPR").[70]

Instead, Baughman secured the scene by removing his spike strips from the roadway,

and remained with Jerry Ashley until an off-duty deputy sheriff escorted Ashley to

the back of the deputy's vehicle.[71]  Baughman *did* radio a request for an emergency

response unit to be sent to the scene of the roadblock, but was told by the dispatch

operator that an ambulance already was en route.[72]

N.    *11:03:02 a.m.*

"At 11:03:02 a.m., the Moores Mill Volunteer Firefighters arrived on the scene

and took control of administering medical treatment to Ashley."[73]  Deputy Thrower

assisted Moores Mill Fire Captain and Paramedic Jason Kalange in removing Jeffrey

Ashley from the back seat of the vehicle.[74]  Captain Kalange checked Ashley's pulse

(none) and breathing (he was not).[75]  Kalange attempted to clear Ashley's airway of

---

[70] *See* Baughman Affidavit ¶¶ 17, 19-20.  Baughman also did not know how to use a defibrillator.  *Id.* at ¶ 18.

[71] *Id.* ¶ 22.

[72] *Id.* ¶¶ 10-11.  *See also* Joint Ex. 2-T at 3 (lines 5-7) (recording Trooper Baughman's radio transmission to dispatch at an unidentified time during the 44 second interval between 10:57:*10* and 10:57:*54*, stating:  "we're 10-99.  Go ahead and get the ambulance en route," and the dispatch operator's response as:  "10-4.  They've been notified.").

[73] Third Thrower Affidavit ¶ 9; *see also* Joint Ex. 3-T at 10 (lines 13-17).

[74] *See* Third Thrower Affidavit ¶ 9; *see also* doc. no. 32 ("Table of Contents of Evidentiary Materials in Support of Motion to Dismiss, Motion to Strike, or, in the Alternative, Motion for Summary Judgment" filed by defendant Casey Thrower), Ex. F (Affidavit of Jason Michael Kalange) ¶ 8 (**hereafter**, "**Kalange Affidavit**").

[75] *See* Kalange Affidavit ¶ 9.

"stomach contents" with a suction device,[76] and administered medical care until the arrival of the HEMSI ambulance.

**O**.   *11:05 a.m.*

The recording removed from the device mounted on the dash of Deputy Thrower's patrol vehicle shows HEMSI's ambulance arriving at 11:04:29, and rolling out of the camera's view at 11:04:45 a.m.  Paramedic David Brown and EMT Scott Pickens assumed control of administering emergency medical treatment to Jeffrey Ashley at 11:05 a.m.[77]  When they arrived, Jeffrey Ashley was on the ground and being attended to by Deputy Thrower and Volunteer Firefighters Bobby Phillips, Ron Bailey, and Jason Kalange, who were "administering chest compressions and respiratory breathing on Jeffrey Ashley."[78]  Brown checked Ashley's vital signs and observed that he was not breathing, did not have a pulse, had no blood pressure, and did not exhibit "capillary refill" — an indication that blood was not flowing properly to the appendages of his body.[79]  Brown also observed that Ashley's pupils were dilated, "which usually indicates there has not been a cardiac function for at least five

---

[76] *Id.* ¶ 10.

[77] *See* Joint Ex. 3-T at 12 (line 6) (recording request of unidentified HEMSI responder as asking for a "Monitor" at 11:05:01); *see also* First Ashley Affidavit ¶ 15 (testifying that Mrs. Green used his cell telephone to call Mrs. Margaret Ashley at 11:05, *after the arrival of the ambulance*).

[78] Second Brown Affidavit ¶ 12.

[79] *Id.* ¶ 14.

minutes."[80]

Brown attempted to insert "an ETT-1" endotracheal tube, to administer oxygen, at approximately 11:06 a.m., but was not successful.[81]  An electrocardiogram (EKG) was performed, and Jeffrey Ashley was found to be "asystole," indicating that he did not have a heartbeat and "had flat-lined."[82]

**P**.    *11:12:12 a.m.*

Jeffrey Ashley was placed in the HEMSI ambulance and departed for Huntsville Hospital at 11:12:12 a.m.[83]  Scott Pickens drove and Mrs. Green rode in the passenger seat of the front cab.[84]  Paramedic David Brown remained with Jeffrey Ashley in the rear compartment, and attempted further rescue procedures en route. For example, Brown administered "a Bag Valve Mask with 15 liters per minute of oxygen,"  and suctioned large quantities of vomit from Ashley's airway.[85]  Brown also attempted to insert an ETT-1 intubation tube four times, but initially was unsuccessful.[86]  Finally, "[w]hen the ambulance was less than one (1) minute from the Huntsville Hospital Emergency Room, [Brown] successfully inserted" an intubation

---

[80] *Id.* ¶ 15.

[81] *Id.* ¶ 16.

[82] *Id.* ¶ 17.

[83] *See* Joint Ex. 8-T at 2 (lines 18-23) (radio transmission from the "Medic 5 ambulance" to HEMSI dispatch at 11:12:12:  "Medic 5, we're Code 3 to Huntsville.  Priority zero.").

[84] *See* Green Depo. at 38.

[85] Second Brown Affidavit ¶ 18.

[86] *Id.* ¶ 19.

tube.[87]

**Q**.   *11:25 a.m.*

Brown's efforts to revive Jeffrey Ashley were for naught.  The ambulance

bearing his body arrived at Huntsville Hospital's Emergency Room at approximately

11:25 a.m.[88]  Ashley's condition essentially had not changed from the time he had

been placed in the ambulance,[89] and he was pronounced dead at the hospital.[90]  Brown

later testified that, based upon his education, training, and experience as a state-

licensed paramedic, he believes that "Jeffrey Ashley was deceased when EMT Scott

Pickens and I arrived at Winchester Road and Riverton Road at approximately 11:04

a.m."[91]

**R**.   *The Length of the Delay*

Plaintiff contends that defendants' detention of Jerry Ashley's automobile at

the roadblock established by Trooper Baughman postponed her decedent's receipt of

medical attention by six minutes, from 10:58 until 11:04 a.m.  The basis for that

---

[87] *Id*. ¶ 20.

[88] *Id*. ¶ 21.  *See also* Joint Ex. 8-T at 3 (lines 1-2) (radio transmission from the Medic 5 ambulance to HEMSI dispatch at 11:24:53: "Medic 5's out at Huntsville.").  *See also id.* at lines 3-5 ("DISPATCH: . . . Medic 5.  I copy you out at Huntsville Hospital.").

[89] *See* doc. no. 32 ("Table of Contents of Evidentiary Materials in Support of Motion to Dismiss, Motion to Strike, or, in the Alternative, Motion for Summary Judgment" filed by defendant Casey Thrower as doc. no. 31), Ex. C (Sept. 18, 2008 affidavit of Ralph Scott Pickens) ¶ 12.

[90] *See* doc. no. 40 ("Plaintiff's Exhibit List"), Ex. G. (Huntsville Hospital emergency room report), at 2.

[91] Second Brown Affidavit ¶ 23.

30

contention is explained in the following extract from Jerry Ashley's first affidavit:

> The EMS unit was first contacted around 10:52, according to the affidavit of David Brown, (defendant's exhibit b, para 4).[92]  They were rerouted at approximately 11:02:57, according to the affidavit of David Brown, (defendant's exhibit b, para 4).[93]  **The EMS unit reached Jeffrey around 11:04, based on Billy's phone call to my mother, Margaret, around 11:05 (see cell record).[94]  I could have reached them by myself at 10:58.  Jeffrey was breathing at 10:58:08**.[95]

Objective evidence indicates, however, that the delay was no more than four minutes. The digital timing device integrated into the circuitry of the audio and video recording equipment mounted on the dash of Deputy Thrower's patrol vehicle shows that Jerry Ashley's automobile was stopped at 10:58:07 a.m.  The parties stipulated during oral argument that Trooper Baughman's roadblock was 3.3 miles east of the place at which Jerry Ashley had arranged to meet HEMSI's ambulance.[96]  Assuming an average speed of 70 miles an hour,[97] it would have taken him two minutes and 50

---

[92] *See* doc. no. 32 ("Table of Contents of Evidentiary Materials in Support of Motion to Dismiss, Motion to Strike, or, in the Alternative, Motion for Summary Judgment" filed by defendant Casey Thrower as doc. no. 31), Ex. B (Sept. 19, 2008 Affidavit of David Earl Brown) (**hereafter**, "**First Brown Affidavit**") ¶ 4 (1st sent.) ("At approximately 10:52 a.m., on May 18, 2006, EMT Scott Pickens and I received a call from HEMSI dispatch requesting us to respond to the Rocket City Quick Stop at Winchester Road and Moores Mill Road.").

[93] *Id*. ¶ 4 (2d sent.) ("At approximately 11:02:57 a.m., we received directions from HEMSI Dispatch to respond to Riverton Road and Winchester Road.").

[94] *See* doc. no. 40 ("Plaintiff's Exhibit List"), Ex. H, line 19 (showing four-minute telephone call made at 11:05 a.m. on May 18, 2006, to 931-607-1734).

[95] First Ashley Affidavit ¶ 15 (boldface emphasis in original, footnotes added).

[96] See the Transcript of oral arguments conducted on Sept. 11, 2009, at 37-38.

[97] This court is required to construe the facts in the light most favorable to the non-moving party, and Jerry Ashley testified that he averaged 65 to 70 miles an hour after leaving his parents' home in Elora, Tennessee.  *See* First Ashley Affidavit ¶¶ 4 and 11.

seconds to travel that distance.[98]  Thus, if Jerry Ashley had not been detained at the

roadblock, he could have reached the ambulance's original destination by 11:01

a.m.[99]  As discussed in Part II(O) of this opinion, *supra*, HEMSI personnel assumed

control of administering treatment at 11:05 a.m.[100]  Thus, the length of the delay in

Jeffrey Ashley's receipt of emergency medical assistance, as *calculated by using the*

*same device to measure the length of delay*, was four minutes:  *i.e.*, from 11:01 to

11:05 a.m.[101]

### III.  DISCUSSION

This case turns upon the question of whether Deputy Thrower and Trooper

Baughman are entitled to "qualified immunity."  Whenever state or county law

---

[98] 60 miles an hour is exactly one mile a minute.  Therefore, a car at a constant speed of 60 mph would cover 3.3 miles in 3.3 minutes, or 198 seconds (3.3 min. x 60 sec. in a min.):  *i.e.*, 3 min. and 18 sec.  At an average speed of 70 mph, the computations would be as follows:  $(60 \div 70)$ x 198 = 169.71427 seconds, or 2 minutes (120 sec.) and 49.71 seconds (169.71427 sec. - 120 sec. = 49.71427).  In round numbers, the time of transit would be 2 minutes and 50 seconds.

[99] This time was computed as follows:  10:58:07 a.m. (time Jerry Ashley stopped at the roadblock) *plus* 2 min. 50 sec. (00:02:50) to drive an additional 3.3 miles @ 70 mph = 11:00:57, or 11:01 a.m. in round numbers.

[100] *See supra* note 77 and accompanying text.

[101] As discussed in note 25 *supra*, the time of relevant events was electronically stamped on audio and video media.  In addition to that evidence, the dispatch centers operated by HEMSI and Madison County Volunteer Fire Departments maintained paper records ("logs") of the times of relevant events.  HEMSI's paper logs reflect that its ambulance arrived at the scene of the roadblock on Winchester highway at 11:04 a.m.  If that entry is correct, then the length of the delay in Jeffrey Ashley's receipt of emergency medical treatment by HEMSI's ambulance personnel was only three minutes, i.e., from 11:01 to 11:04 a.m.

However, in order to view the evidence in the light most favorable to plaintiff, this court has utilized *the same evidentiary source* — Deputy Thrower's dash-mounted recording device — to measure the temporal differential between the time when Jerry Ashley's auto was stopped at the roadblock on Winchester highway, and the time when HEMSI's ambulance arrived at that location.

enforcement officers are sued personally, or in an "individual capacity," for money damages under 42 U.S.C. § 1983, they are entitled to assert qualified immunity as a defense to the claim. *See*, *e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991). Qualified immunity is an affirmative defense, and it provides complete protection for state officials whose discretionary acts violate "no clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also*, *e.g.*, *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001) (same). The public policy purpose undergirding the defense is that of allowing public officials to perform discretionary functions without the fear of personal liability or harassing litigation. *See*, *e.g.*, *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

In order to be entitled to this immunity from suit and damages, therefore, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations and internal quotation marks omitted). However, plaintiff does not dispute that both defendants were acting within the scope of their discretionary authority.

Consequently, the burden shifts to her to demonstrate that qualified immunity is not appropriate by showing the deprivation of a federal constitutional or statutory right that was clearly established on the date of the events giving rise to this action. *See*, *e.g.*, *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991).

The Supreme Court prescribed a two-part analytical-framework for determining whether a public official is entitled to the protections of qualified immunity in *Saucier v. Katz*, 533 U.S. 194 (2001); *see also*, *e.g.*, *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009) (recognizing that this Circuit generally follows *Saucier's* two-part test when "analyzing the applicability of qualified immunity"). Under that test, the "threshold question" that must be asked is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If that question is answered affirmatively, the court may proceed to determine whether that right was "clearly established" at the time of the violation. *Id.*[102]

**A.**   *Did Defendants Violate a Constitutional Right?*

Plaintiff's contention that defendants were deliberately indifferent to the

---

[102] The Supreme Court recently relieved lower courts from mandatory adherence to the order of the two-part *Saucier* test. *See Pearson v. Callahan*, — U.S. —, 129 S. Ct. 808, 818 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

Even so, under the circumstances of this case, in which the initial issue in dispute is the question of whether there is a Constitutional basis for plaintiff's claim, the analytical sequence recommended in *Saucier* will be followed.

serious medical needs of Jeffrey Ashley — as demonstrated by those actions that delayed his receipt of emergency medical treatment and, allegedly, thereby caused his death — begs a question: "Did the *Constitution* impose a *duty* upon defendants to ensure that Jeffrey Ashley promptly received medical treatment?" The answer to that question is important because § 1983 imposes liability only for violations of rights protected by the Constitution and federal statutes, "not for violations of duties of care arising out of tort law." *Baker v. McCollan*, 443 U.S. 137, 146 (1979).[103] Thus, "the proper resolution of this case requires us first to determine whether the Constitution grants a right to medical care and treatment in these circumstances." *Id*.

Generally speaking, a state "is under no constitutional duty to provide substantive services [*such as medical treatment*] for those within its border." *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) (citations omitted, bracketed alteration added); *see also*, *e.g.*, *Wideman v. Shallowford Community Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987) (holding that there is no "general right" under either the Constitution or federal statutes "to the provision of medical treatment and services by a state or municipality"). The holdings in *Youngberg* and *Wideman* do not end the

---

[103] 42 U.S.C. § 1983 does not create any substantive rights; instead, the statute merely provides a remedial vehicle for seeking monetary damages and other relief from state, county, or municipal entities and officials whose policies or conduct under color of state law deprived a plaintiff of rights, privileges, or immunities established elsewhere, by either the United States Constitution or federal statutes. *See*, *e.g.*, *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (observing that § 1983 is not "itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred") (citations and internal quotation marks omitted).

inquiry, however, because both the Supreme Court and Eleventh Circuit have indicated that "the existence of a 'special custodial or other relationship' between an individual and the state may trigger a constitutional duty on the part of the state to provide certain medical or other services." *Wideman*, 826 F.2d at 1034. The factual circumstances in which such "special relationships" have been found to exist

> may be viewed on a continuum. At one extreme is the person whom the state has completely deprived of his liberty by either incarceration or institutionalization, such as a prison inmate, *see Estelle* [*v. Gamble*, 429 U.S. 97 (1976)], or an involuntarily committed mental patient, *see Youngberg*, *supra*. The rights of the individual and the corresponding duties of the state are clearest and strongest in those contexts. Still protected, but somewhat further in along the continuum, are pretrial detainees, *see Hamm* [*v. DeKalb County*, 774 F.2d 1567 (11th Cir.1985)], and arrestees or suspects in police custody, *see City of Revere* [*v. Massachusetts General Hosp.*, 463 U.S. 239 (1983)]. At the opposite end of the continuum, however, are "members of the general public, living in the free society, and having no special custodial or other relationship with the state." *Fox v. Custis*, 712 F.2d 84, 88 (4th Cir. 1983). Clearly, no right-duty relationship exists between those individuals and the state. *See id*.; *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982).

*Wideman*, 826 F.2d at 1035 n.7.

On the date of his death, Jeffrey Ashley had not been convicted of a crime, nor even charged with the commission of one. Yet, he was in the "custody" of Deputy Thrower and Trooper Baughman just as effectively as if he had been. His sources of private aid had been cut off. He did not have the ability to drive the automobile in which he was riding as a passenger, and the only persons who could transport him

beyond the site of the roadblock on Winchester Road to the pre-arranged rendevous with the HEMSI ambulance either were not permitted to do so (*i.e.*, *Jerry Ashley and Mrs. Billie Green*), or did not do so (*i.e.*, *defendants Thrower and Baughman*). Plaintiff contends, therefore, that defendants placed Jeffrey Ashley in a worse situation than he would have faced, if defendants had not acted at all.  Stated differently, but for the defendants' discretionary choices and actions, Jeffrey Ashley would have received medical attention from the ambulance attendants four minutes earlier.  As a consequence, plaintiff argues, defendants imposed upon themselves a constitutional duty to ensure that her decedent received reasonably prompt and appropriate medical attention for an unquestionably serious medical condition.  That contention finds support in *Wideman*, *supra*, where the Eleventh Circuit observed that state or county officials can impose upon themselves a constitutional duty to provide medical care by, among other acts, "cutting off potential sources of private aid":

> [A] constitutional duty can arise only when a state or municipality, by exercising a significant degree of custody or control over an individual, places that person in a worse situation than he would have been had the government not acted at all.  *Such a situation could arise by virtue of the state* affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, *or cutting off potential sources of private aid*.  *See Walker* [*v. Rowe*], 791 F.2d [507,] 511 [(7th Cir. 1986)]; *Estate of Gilmore* [*v. Buckley*], 787 F.2d [714,] 722 [(1st Cir. 1986)].   The key concept is the exercise of coercion, dominion, or restraint by the state.  *The state must somehow significantly limit an individual's freedom or impair his ability to act on his own before it will be constitutionally required to care and provide*

*for that person.*

*Wideman*, 826 F.2d at 1035-36 (emphasis and bracketed alterations added, footnote omitted).  *Cf. DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 200 (1989) (holding that a special relationship giving rise to potential liability under the substantive component of the Fourteenth Amendment's Due Process Clause comes into existence "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — *e.g.*, food, clothing, shelter, *medical care*, and reasonable safety") (emphasis added, citations omitted).

The conclusion that, by cutting off potential sources of private aid, defendants imposed upon themselves a constitutional duty to ensure that Jeffrey Ashley received reasonably prompt medical attention, does not end the discussion, however.  Instead, it shifts the analysis to an evaluation of the issues discussed below.

**1**.    *The elements of a* prima facie *"deliberate indifference" claim*

To prevail on her claim that defendants were deliberately indifferent to Jeffrey Ashley's medical needs, plaintiff must prove that (*a*) Jeffrey Ashley had an objectively serious medical need, (*b*) defendants deliberately disregarded that need by engaging in conduct that was more than gross negligence, and (*c*) such conduct

38

was the proximate cause of Jeffrey Ashley's death.[104]   Each of these elements is

addressed in the following sections.

          **a**.   *serious medical need*

The term "serious medical need" is generally defined as "one that has been

diagnosed by a physician as mandating treatment *or one that is so obvious that even

a lay person would easily recognize the necessity for a doctor's attention*."   *Hill v.

Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir. 1994)

(emphasis added, citation and internal quotation marks omitted).   Defendants do not

deny that Jeffrey Ashley's condition met that standard.   *Cf. Bozeman v. Orum*, 422

F.3d 1265, 1272 (11th Cir. 2005) ("No one disputes that [plaintiff's decedent] had a

serious medical need once his breathing was impaired and he became unconscious.").

          **b**.   *deliberate indifference*

Plaintiff contends that defendants' detention of Jerry Ashley at the roadblock,

---

[104] *See*, *e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (holding that the term *deliberate indifference* "describes a state of mind more blameworthy than negligence," but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result"); *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (addressing the elements of a Fourteenth Amendment deliberate indifference claim by a representative of the estate of a pretrial detainee that county corrections officers had delayed for a period of fourteen minutes the decedent's receipt of medical treatment for injuries sustained during a struggle with the officers); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (addressing the elements of an Eighth Amendment deliberate indifference claim by a jail inmate who had complained for several months of severe stomach pains, and who was diagnosed with colon cancer at hospital shortly after his release from jail).  *See also Marsh v. Butler County*, 268 F.3d 1014, 1024 n.5 (11th Cir. 2001) (*en banc*) (recognizing that "the standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments").

thereby delaying Jeffrey Ashley's receipt of medical treatment for four minutes,[105] demonstrates that defendants were "deliberately indifferent" to Jeffrey Ashley's admittedly serious medical needs.  That contention turns upon the strength of plaintiff's circumstantial evidence indicating that each defendant's subjective mental state when detaining the Ashley vehicle was more blameworthy than negligence, but not necessarily as culpable as conduct undertaken with the specific intent to cause harm.  *See*, *e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (holding that the term *deliberate indifference* "describes a state of mind more blameworthy than negligence," but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result").

> *i*.    *defendants' subjective mental states*

To establish that a defendant was "deliberately indifferent" to a person's serious medical need, a plaintiff must prove that the defendant (*a*) was aware of a substantial risk that serious harm would result if the person's medical need was left unattended, but (*b*) disregarded that risk (*c*) by conduct that was more than gross negligence.  *See*, *e.g.*, *Bozeman*, 422 F.3d at 1272 (holding that, in order to satisfy the "subjective element" of a deliberate indifference claim, a plaintiff "must prove three things:  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk;

---

[105] See the discussion in Part II(R) of this opinion *supra*.

(3) by conduct that is more than [gross] negligence") (citation and internal quotation marks omitted, bracketed alteration in original); *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004) (observing that neither negligence nor "even gross negligence" satisfies the state-of-mind requirement established by the Supreme Court's decision in *Farmer*); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490-91 (11th Cir. 1996) (observing that, after *Farmer*, proof of more than "gross negligence" is required).[106]

**(A)** *defendants' subjective perceptions of the seriousness of Jeffrey Ashley's medical needs*

Both defendants subjectively perceived that Jeffrey Ashley had a serious medical need, as demonstrated by the fact that each, independently, requested an ambulance. Deputy Thrower, in fact, transmitted four requests for emergency medical assistance. The first occurred immediately after Jerry Ashley refused to obey Thrower's order to stop his automobile at the traffic signal governing the intersection of Winchester with Bell Factory Road, saying: "I've got a man dying in the back seat, my brother."[107] Deputy Thrower obviously gave that assertion serious consideration because, at 10:57:29 a.m., less than ten seconds after the statement was uttered, he

---

[106] Compare the authorities cited in text to the following opinions that frame the state-of-mind requirement as "conduct that is more than *mere* negligence": *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) ("To establish the second element, deliberate indifference to the serious medical need, the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence."); *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003) (same); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (same).

[107] Joint Ex. 3-T at 1 (lines 23-24).

transmitted a direction for the Sheriff's dispatcher to send medical units to the intersection of Winchester and Moores Mill Roads.[108]

Just after Jerry Ashley's automobile stopped at Trooper Baughman's roadblock, Deputy Thrower again made a radio transmission to the Sheriff's dispatch center, to provide emergency responders their exact location.[109]

Deputy Thrower's placed his third radio call at 10:59:06 a.m., to reinforce the seriousness of Jeffrey Ashley's medical condition:  he directed the dispatch operator to "Tell them [*the emergency responders*] Code 3 [*a protocol instructing an emergency vehicle to respond as fast as traffic will permit, using lights and siren*].[110]

Deputy Thrower called the dispatch center yet a fourth time, at 11:02:08 a.m., asking for the ambulance's estimated time of arrival.[111]

Finally, as previously noted, Trooper Baughman also, and independently of Deputy Thrower, requested that an ambulance be sent to the scene of his roadblock immediately after Jerry Ashley was taken into custody.[112]

### (B)   *disregard of the risk of harm*

Whatever else might be said of Deputy Thrower's actions, it cannot be said that

---

[108] *See supra* note 46 and accompanying text.

[109] See the discussion in Part II(G) of this opinion, *supra*.

[110] See the discussion in Part II(K) of this opinion, *supra*.

[111] *See* Joint Ex. 3-T at 8 (lines 13-14) ("What's the ETA to HEMSI?").

[112] *See supra* note 72 and accompanying text.

he disregarded the risk that serious harm could flow from ignoring Ashley's medical condition, as demonstrated by his attempts to obtain emergency medical assistance, to ascertain Ashley's vital signs, and to use an automated external defibrillator in an attempt to revive him.  *Within thirty seconds of catching up to the Ashley vehicle at Baughman's roadblock*, Thrower began a personal assessment of Jeffrey Ashley's condition.[113]  *Less than one minute after that*, Thrower began using his portable defibrillator.[114]  Thus, the evidence clearly demonstrates that Thrower did not "ignore" a risk of serious harm to Jeffrey Ashley.  To the contrary, the record reflects that he comprehended the risks and attempted to respond.

Trooper Baughman, on the other hand, did nothing of consequence after his initial call for an ambulance to be sent to the scene of his roadblock, and after being informed that one was en route.  Instead, he seemed more intent upon playing the old military/law-enforcement game euphemistically known by the acronym "CYA": *that is*, Baughman attempted repeatedly to persuade Deputy Thrower to charge Jerry Ashley with a moving traffic violation.[115]

---

[113] See the discussion in Part II(J) *supra*.

[114] See the discussion in Part II(M) *supra*.

[115] *See* Joint Ex. 3-T at 7-8 (Baughman advises Thrower at 11:01:23:  "I'd get him for reckless endangerment."); *id*. at 14 (lines 16-18) (Trooper Baughman advises Deputy Thrower at 11:06:25:  "Well, I mean, I don't want to tell you what to do, but I would get him for reckless endangerment."); *id*. at 19-20 (where, in response to Deputy Thrower's statement at 11:11:21 that "This is a tough situation," Trooper Baughman states "I'd write him some tickets anyway").  And then there is the following exchange, beginning at 11:13:22 and ending at 11:15:13:

Despite that, plaintiff has done nothing to discredit Baughman's testimony that he lacked the knowledge, skills, and ability to assist Deputy Thrower in administering CPR, or in providing any other medical assistance.   Even if Baughman did possess the skill to assist in administering some form of emergency medical treatment to Jeffrey Ashley, his ability to do so was hampered by the fact that Jeffrey Ashley was confined in the backseat of his brother's automobile, and Deputy Thrower and Mrs.

---

TROOPER BAUGHMAN:  Come talk to me.  What are you going to do?

DEPUTY THROWER:  Write up some tickets and let him go.

TROOPER BAUGHMAN:  You already called a  wrecker, or what?

DEPUTY THROWER:  Wrecker for what?

TROOPER BAUGHMAN:  For his car.  I thought I heard you calling for one.

DEPUTY THROWER:  No, no, no.

LT. STEVE WATSON:  He's going to write him some tickets and let him go.

DEPUTY THROWER:  What do you want?  What do you think I ought to do?

LT. STEVE WATSON:  I would write him a reckless driving — and be done with it.

. . . .

DEPUTY THROWER:  Hell, I'll give him a reckless driving ticket and reduce it to speeding in court.

Joint Ex. 3-T at 21-23 (electronic time notations omitted).  Finally, there is the exchange between Deputy Thrower and Trooper Baughman during which, in response to Thrower's question asking Baughman whether *he* intended "to write him for anything?," Baughman mans up and, in a grand show of fraternal solidarity for the spot in which his roadblock had placed Deputy Thrower, says: "No.  I'm not.  I'm not.  I am going to let you handle it."  *Id*. at 20 (lines 17-23).

44

Green were on either side of him.  Baughman reasonably could have concluded,
therefore, that his attempt to wedge himself into that limited space would have
hampered, rather than helped, efforts to revive Jeffrey Ashley.   Furthermore,
Baughman reasonably could have concluded that Deputy Thrower's efforts were
sufficient, and there was no need for him to join in.  Under these circumstances, it
cannot be said that either Thrower or Baughman disregarded the risk that serious
harm could flow from ignoring Jeffrey Ashley's medical condition.

(<b>C</b>)   <i>more than gross negligence</i>

There is no evidence that either defendant acted with a sufficiently culpable
state of mind: *that is*, that their conduct constituted more than "gross negligence."
The following passage from the Eleventh Circuit's opinion in the *Hill* case is
instructive:

> "A defendant must *purposefully ignore or fail to respond* to a prisoner's
> pain or possible medical need in order for deliberate indifference to be
> established." *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992)
> (emphasis added).   Implicit in the *Estelle* deliberate indifference
> standard is *knowledge* of the *particular medical condition* in order to
> establish intent or "a sufficiently culpable state of mind," *Wilson*, 501
> U.S. at 298, 111 S. Ct. at 2324, *to deny or to delay purposely* "access to
> medical care" or intentionally to interfere "with the treatment once
> prescribed," *Estelle*, 429 U.S. at 104-05, 97 S. Ct. at 291.   Thus,
> "*[k]nowledge* of the asserted serious needs or of circumstances clearly
> indicating the existence of such needs, is *essential* to a finding of
> deliberate indifference." *Horn ex rel. Parks v. Madison County Fiscal
> Court*, 22 F.3d 653, 660 (6th Cir.) (emphasis added), *cert. denied*, 513
> U.S. 873, 115 S. Ct. 199, 130 L. Ed. 2d 130 (1994); *see Mandel v. Doe*,

45

888 F.2d 783, 788 (11th Cir. 1989).

*Hill*, 40 F.3d at 1191 (emphasis in original, footnotes omitted).

As discussed above, Deputy Thrower took reasonably prompt actions to address Jeffrey Ashley's medical problems. It is true that a different course of action might have been more effective, but the essential point is that Thrower *attempted* to revive Ashley. He did not purposely ignore, or fail to respond to, Ashley's medical needs. The fact that Deputy Thrower might have done more or a better job demonstrates only negligence, *not* constitutionally actionable deliberate indifference.

Trooper Baughman may have been incorrect in assuming that any efforts he could have made to assist Jeffrey Ashley would have been counterproductive, or that Deputy Thrower was adequately addressing Ashley's needs, but his failure to accurately judge the situation cannot support a finding of anything more than gross negligence.

   **c.**   *causation*

Even though it rarely is mentioned in reported decisions, "causation is an essential element of a section 1983 cause of action." *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).[116] As the Ninth Circuit observed in *Arnold v. International*

---

[116] *See also, e.g., Troupe v. Sarasota County*, 419 F.3d 1160, 1165 (11th Cir. 2005) (holding that "[a] § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation," and that "[r]ecovery of damages is limited to those injuries proved to be caused by the defendants"); *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) ("In addition, section 1983 requires proof of an affirmative causal

*Business Machines Corp.*, 637 F.2d 1350 (9th Cir. 1981), causation under § 1983 has

two components:  causation in fact and proximate causation.  *See id*. at 1355 ("The

causation requirement of section[] 1983 . . . is not satisfied by a showing of mere

causation in fact . . . .  Rather, the plaintiff [also] must establish proximate or legal

causation.") (citation omitted).

Furthermore, the Eleventh Circuit's opinion in *Hill v. Dekalb Regional Youth*

*Detention Center*, 40 F.3d 1176 (11th Cir. 1994), established that a § 1983 plaintiff

"who complains that delay in medical treatment rose to [the level of] a constitutional

violation must place verifying medical evidence in the record to establish the

detrimental effect of delay in medical treatment."  *Id*. at 1188 (footnoted citations

omitted).  The only evidence offered by plaintiff bearing upon this element was the

affidavit of a Registered Nurse named David Romine, which reads as follows:

> My name is David Romine and I am over the age of nineteen
> years, of sound mind, and have firsthand knowledge of the facts set
> forth.
>
> I am a registered nurse for 29 years.  I graduated from the St.
> Vincent School of Nursing in 1980.  I was a certified heart monitor tech
> at Brookwood intensive care for 4 years.  I have worked in cardiac
> intensive care units as a registered nurse for [*an unspecified number of*]

---

connection between the official's acts or omissions and the alleged constitutional deprivation.");
*Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) ("Causation
is a concept that is not often discussed or explicitly stated in civil rights cases.  When courts examine
the elements of civil rights causes of action, they tend to focus on the substantive aspects of liability
under the statutes.  *Although causation is not stated explicitly in these formulations, it is an implicit
requirement*.") (citation omitted) (emphasis supplied).

years and performed countless CPR's, defibrillations, and tended to heart attack victims countless times. I am a certified CPR with the American Heart Association. I have administered emergency cardiac drugs during code blue situations countless times. I have read the tapes from the defibulators during the defibrillation process to monitor the heart. I am well acquainted with the proper procedure for treatment of emergency cardiac arrest situations.

I have read the report of the EMT and the Huntsville Hospital Report, the affidavit of Deputy Thrower, [and] the affidavit[s] of Jason Kalange, Scott Pickens and David Brown.

According to Thrower, he connected the defibulator at 10:59:34 and that [sic] the machine (later) told him not to shock.

Defibulators produce paper that show (1) asystole (flatline) or (2) a non-shockable rhythm, or (3) a shockable rhythm, to let the user know the condition of the heart rhythm during defibrillation, a copy of an example is attached. The "do not shock" message can be telling the user not to shock because there is a normal rhythm (breathing) and the shock could very well kill the patient. It could be telling the user that there is slight electrical activity and shocking could do more harm than good. However, the paper from the defibulator would tell exactly what the condition of the heart was during defibrillation and if the heart was asystole, the paper will say so. I agree with David Brown if he is saying in his affidavit, para 18, that the "do not shock" sign means that the patient has a heart-beat that cannot be corrected by defibrillation.[117]

I absolutely disagree with David Brown in para 19 if he says that the "do not shock" sign means that Jerry Ashley was dead.[118]

---

[117] *See* First Brown Affidavit ¶ 18 ("Based on my medical experience and education as a State of Alabama licensed paramedic, when a defibrillator or AED advises the user to not shock a patient, the patient usually does not have a heartbeat rhythm that can be restarted by an AED or defibrillator.").

[118] It does not appear to this court that the testimony of HEMSI paramedic David Brown in paragraph 19 of his first affidavit either stated, or was intended to state, that the defibrillator's audible "Do Not Shock" warning meant that Jeffrey Ashley was dead; instead, Brown said: "Based on my medical experience and education as a State of Alabama licensed paramedic, it is my belief

48

Emergency CPR or AED is not proper medical treatment for a cardiac arrest when an EMS unit is available.  Proper medical treatment is being treated by an EMS unit and then to a hospital.  Emergency CPR or AED is simply all you can do until proper medical treatment is obtained.  An EMS unit can provide basic life support, defibrillation, cardiac drugs, the insertion of endotracheal breathing tubes, and trained monitoring.  The hospital can then provide more diagnostic evaluation.

When a person is in cardiac arrest, time is of the essence.  Mere minutes can be the difference between full recovery, and death or permanent damage.  If the officers delayed the decedent from proper medial attention for even a few minutes, they lessened his chance of survival.[119]

This court questions whether Mr. Romine's testimony satisfies plaintiff's burden in opposing defendants' motions for summary judgment: *that is,* to come forward with evidence demonstrating that the delay worked by defendants' detention of Jerry Ashley's automobile was the proximate cause of Jeffrey Ashley's death.  In that regard, it does not require a Registered Nurse with experience in cardiac intensive care units to establish that, "[w]hen a person is in cardiac arrest, time is of the essence. . . .  If the officers delayed the decedent from proper medical attention for even a few minutes, they lessened his chance of survival."[120]  Indeed, the Eleventh Circuit so held in *Bozeman v. Orum*, 422 F.3d 1265 (11th Cir. 2005), a case in which

---

that Jeffrey Archer was deceased when EMT Scott Pickens and I arrived at Winchester Road and Riverton Road at approximately 11:04 a.m." *Id.*¶ 19.

[119] Doc. no. 56 ("Plaintiff's Exhibit List in Support of Plaintiff['s] Response to Defendants' Motion[s] for Summary Judgment"), Ex. 2 (Feb. 18, 2009 affidavit of David Romine).

[120] *Id*. (last para.).

the Court condemned the failure of county jail wardens to request medical assistance for an unconscious pretrial detainee for a period of fourteen minutes, saying that: "A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes." *Id*. at 1273.

Instead, the Eleventh Circuit's opinion in *Hill v. Dekalb Regional Youth Detention Center*, *supra*, contemplates medical evidence verifying that the delay complained of was the proximate cause of the harm for which a § 1983 plaintiff seeks monetary compensation. *See Hill*, 40 F.3d at 1188 (holding that a § 1983 plaintiff "who complains that delay in medical treatment rose to [the level of] a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment"); *see also id*. at 1190 ("[T]he Hills have submitted no medical evidence explaining how the four-hour delay in taking Hill to the hospital detrimented or worsened his medical condition.").

In contrast, HEMSI paramedic David Earl Brown testified directly to the causation issue in the following paragraphs of his second affidavit:

> 11.   At approximately 11:04 a.m., EMT Scott Pickens and I arrived at Winchester Road and Riverton Road.  I was informed by dispatch that we were responding to the cardiac arrest of an overweight 42 year old male with Downs Syndrome, later known to me as Jeffrey Ashley.

12.     Upon our arrival at Winchester Road and Riverton Road, Jeffrey Ashley was on the ground and being attended to by Deputy Casey Thrower of the Madison County Sheriff's Department and Moores Mill Volunteer Firefighters Bobby Phillips, Ron Bailey, and Jason Kalange.   The Moores Mill Volunteer Firefighters were administering chest compressions and respiratory breathing on Jeffrey Ashley.

13.     At Winchester Road and Riverton Road, I was told that Jeffrey Ashley had Downs Syndrome, cardiac heart failure, and had lost consciousness, approximately 10 minutes prior to our arrival.

14.     I checked Jeffrey Ashley's airway, his breathing, and his circulation.  Jeffrey Ashley did not have a pulse; was not breathing, had no blood pressure; and did not have capillary refill, which indicates that the blood is not flowing properly to the appendages.

15.     I observed that Jeffrey Ashley's pupils were dilated, *which usually indicates there has not been a cardiac function for at least five minutes*.[121]

If the opinion emphasized in the last paragraph of David Brown's affidavit quoted above is correct, then Jeffrey Ashley died at 11:00 a.m., a minute before Jerry Ashley could have reached the intersection to which the ambulance originally had been dispatched.[122]

**B**.     *Clearly Established Law*

For all of the reasons discussed above, this court does not believe that plaintiff

---

[121] Second Brown Affidavit ¶¶ 11-15 (emphasis supplied).

[122] See the discussion in Parts II(C), (F), and (R) of this opinion, and particularly the text accompanying note 99 *supra* ( concluding that, "if Jerry Ashley had not been detained at the roadblock, he could have reached the ambulance's original destination by 11:01 a.m.").

has established a constitutional violation — that defendants were "deliberately indifferent" to Jeffrey Ashley's serious medical needs. However, and assuming for the sake of discussion that plaintiff had done so, defendants still would be shielded from liability for civil damages because plaintiff has not demonstrated that their actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The Supreme Court has said that, when attempting to determine whether the unlawfulness of a law enforcement officer's actions was clearly established, "the salient question" that ought to be asked is "whether the state of the law" on the date of the events forming the basis of the plaintiff's § 1983 claims gave the officer "fair warning" that his treatment of the plaintiff (or, in this case, plaintiff's decedent) was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).[123]

The Eleventh Circuit generally recognizes "three sources of law" that may place law enforcement officers on notice of federal statutory or constitutional rights: *i.e.*, "specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." *Goebert v. Lee County*, 510 F.3d 1312, 1330

---

[123] The requirement for a § 1983 plaintiff to also show that the right violated by defendants was "clearly established" operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. at 206.

(11th Cir. 2007).  There are no specific statutory or constitutional provisions that apply to the circumstances of this case.  Thus, the question this court must answer is whether "relevant decisions" and "factually similar cases" decided by the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the Alabama Supreme Court had established,[124] as of May 18, 2006, that the Constitution imposed a duty upon defendants to ensure that plaintiff's decedent received medical care and treatment without delay in the specific circumstances that defendants confronted on Winchester Road.  *See*, *e.g.*, *Pearson v. Callahan*, — U.S. —, 129 S. Ct. 808, 814-15 (2009) (holding that the search for "clearly established" law "must be undertaken in light of the specific context of the case, not as a broad general proposition"); *Lee v. Ferraro*, 284 F.3d 1188, 1190, 1194 (11th Cir. 2002) (same); *Barts v. Joyner*, 865 F.2d 1187, 1194 (11th Cir. 1989) ("The line is not to be found in abstractions — to act reasonably, to act with probable cause, and so forth — but in studying how these abstractions have been applied in concrete circumstances.").

As of the date of this opinion, however, no decision by the Supreme Court, or the Eleventh Circuit, or the Alabama Supreme Court has addressed facts similar to those confronted by Deputy Thrower and Trooper Baughman.  For such reasons,

---

[124] *See*, *e.g.*, *Marsh v. Butler County*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (*en banc*) ("When case law is needed to 'clearly establish' the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state.") (citation omitted).

another judge of this court dismissed a deliberate indifference to medical care claim "because the law [was] not established, clearly or otherwise, that immediately taking an arrestee to medical technicians a short distance away where an ambulance [was] available is deliberately indifferent." *Hendon v. City of Piedmont*, 163 F. Supp. 2d 1316, 1321 (N.D. Ala. 2001) (Propst, J.) (bracketed alterations added, footnote omitted).[125]

---

[125] The plaintiff in the *Herndon* case was a 74 year-old woman who suffered from coronary heart disease, and who had undergone three bypass surgeries. She also suffered from depression and other medical problems. When she awoke on the morning of July 7, 2000, she had difficulty breathing normally. Even so, while driving her son to a friend's house on a hot day (it was 102 degrees) in a pickup truck with poorly functioning air conditioning equipment, she

> came upon an intersection in Piedmont, Alabama, where Officer Cunningham of the Piedmont Police Department was attending an oncoming funeral procession. The plaintiff drove around the police car which had flashing lights. She had seen the funeral procession but knew that she "couldn't sit there an hour in the sun." She told her son that she could not help it if they were going to stop her, "I'm smothering."

> Officer Cunningham made a radio call to Officer Reil who pursued and stopped the plaintiff. She gave Officer Reil her driver's license and he returned to his car to radio for information on the license. Officer Cunningham had arrived and was writing her a ticket. At that point, the plaintiff had not suggested that she had a medical problem. She did have a disabled person sticker on her truck tag. After she gave Officer Reil the license and he returned to his car, plaintiff got out of her vehicle. Up to that point, she had not suggested a need for medical assistance. She then told Officer Riel that she was smothering and needed to go to a doctor. He allegedly told her to get back in her truck "and don't move." She got back in her truck, told her son that she was smothering and was going to the doctor. She told her son to get out of the truck and "tell them I'm going to the doctor." The son got out and plaintiff drove off without waiting for the officers. The officers followed her with flashing lights thinking that she was speeding. Officer Reil next tried to stop the plaintiff near an intersection where he pulled in front of her truck. When he backed off, she continued. Officer Reil followed her again and blocked her truck at a place near Dr. Ulrich's office. Dr. Ulrich had previously told the plaintiff not to come to him with such a problem, but to call an ambulance or go to the hospital.

Indeed, this court has found only two cases addressing facts even remotely similar to the present action, but neither of them found constitutional violations. *See Tagstrom v. Enockson*, 857 F.2d 502 (8th Cir. 1988), *rev'g Tagstrom v. Pottebaum*, 668 F. Supp. 1269 (N.D. Iowa 1987); *Cannon v. City of Philadelphia*, 86 F. Supp. 2d 460 (E.D. Pa. 2000), *aff'd sub nom. Cannon v. Beal*, 261 F.3d 490 (3d Cir. Apr. 23, 2001) (Table No. 00-1208). For example, the female plaintiff in *Cannon* suffered a heart attack while the streets leading out of her neighborhood were blocked by police barricades. She complained to police officers that she was having chest pains, and needed to be transported to a hospital, but the officers refused to assist her.[126]   A neighbor named "Maiden" then offered

to drive plaintiff the two blocks to the hospital.  Maiden was unable to

---

Officer Reil "helped me [plaintiff] out of the car."  She again told Reil that she was smothering and having trouble breathing.  Reil put handcuffs on the plaintiff after, according to him, she slapped him.  Her wrist was somewhat cut, and bled.  No stitches or sutures were required.  The plaintiff admitted that no officer struck or hit her with anything.  After she was placed in a police car she was given her nitroglycerine by her son.  The plaintiff was immediately taken to the Piedmont Police Station where she was immediately examined by emergency medical technicians and shortly thereafter transported by ambulance to the Gadsden [Alabama] Regional Hospital where she was seen by Dr. Peter Szeto, a board certified cardiologist.  Dr. Szeto testified, inter alia, [that plaintiff had suffered a "small" myocardial infarction (heart attack)].

*Hendon v. City of Piedmont*, 163 F. Supp. 2d 1316, 1318-20 (N.D. Ala. 2001) (Propst, J.) (bracketed alterations added, footnote omitted).

[126] *See Cannon v. City of Philadelphia*, 86 F. Supp. 2d at 464 ("Then, the plaintiff asked the officers if they could drive her to the hospital and explained again that she thought she was having a heart attack.  The officers told the plaintiff that they would not take her to the hospital.  Plaintiff claims that her condition worsened as she waited for transportation (from chest pains and shortness of breath to back pain and left arm pain radiating down to her elbow).") (footnote omitted).

take her there, however, because the street was blocked with police cars. Therefore, plaintiff walked, with the assistance of Maiden, to the hospital.  Maiden estimated that they walked a quarter mile from the plaintiff's home to the hospital.  Plaintiff asserts that her condition worsened during the walk to the hospital.  As a result of the heart attack, plaintiff sustained permanent heart damage and must take heart medication for the rest of her life.  Additionally, plaintiff asserts that she has "changes of consciousness," mood and behavior and has been diagnosed with Posttraumatic Stress Disorder.

86 F. Supp. 2d at 464.  The plaintiff claimed that the police officers' failure to transport her to the hospital, and actively delaying her efforts to reach the hospital, violated her Fourteenth Amendment right to substantive due process.  The district court determined, however, that while the officers' conduct may have been negligent or worse, it did not rise to the level of a constitutional violation.  *See id.* at 470.

The Eighth Circuit's opinion in *Tagstrom* addressed the claims of a plaintiff who had been seriously injured after losing control of his motorcycle while fleeing from police at high speed.  The plaintiff claimed that the police officer who first responded to the scene of the wreck had been deliberately indifferent to his medical needs.[127]  The Eighth Circuit held, however, that there was no basis for a deliberate

---

[127] The essential facts of the *Tagstrom* case were reported in the underlying district court opinion as follows:

The events which give rise to this suit began at approximately 2:00 on the morning of April 7, 1984.  The plaintiff was riding a motorcycle through western Sioux City when Defendant Pottebaum, a Sioux City police officer, saw the plaintiff go through a stop sign without stopping and noticed that his headlight was not on. The plaintiff veered to avoid a collision with another vehicle and laid his motorcycle on its side in the intersection.  Defendant Pottebaum stopped and got out, but the plaintiff picked up his bike and took off.  Pottebaum gave pursuit and was led on an

indifference claim when the officer had immediately called for an ambulance to

respond to the scene, and the ambulance had arrived within six minutes of the call.

>        Enockson was in no way deliberately indifferent to Tagstrom's
> medical needs. *It is undisputed that Enockson called an ambulance for*
> *Tagstrom immediately upon seeing the accident and that the ambulance*
> *arrived within six minutes or less.*   Although Enokson stayed with
> Pottebaum [*i.e.*, a police officer who also was seriously injured in the
> incident] after calling the ambulances, other officers involved in the
> chase were on the scene quickly and watched over Tagstrom.   *Given*
> *these facts, there can be no question that Enockson did not intentionally*
> *deny or delay medical treatment for Tagstrom. Mills v. Smith*, 656 F.2d
> 337, 340 (8th Cir. 1981) (no deliberate indifference when, in response
> to prisoner's complaint, prisoner was checked by paramedic and sent to
> hospital within one and a half hours); *cf.*, *e.g.*, *Whitley v. Albers*, 475
> U.S. 312, 319, 106 S. Ct. 1078, 1084, 89 L. Ed. 2d 251 (1985)
> (deliberate indifference is characterized by "obduracy and wantonness"
> in the denial of necessary treatment); *Cummings v. Roberts*, 628 F.2d
> 1065, 1068 (8th Cir. 1980) (question of fact raised when plaintiff
> alleged he was deliberately denied medical treatment for three days).

*Tagstrom*, 857 F.2d at 503-04 (emphasis and bracketed alteration added).

>        Hence, to the extent that the law is "established" at all, it does not support the

---

eight-mile tour throughout most of western and northern Sioux City at speeds of 70
to 80 miles an hour.  Two roadblocks were set up to stop the plaintiff, but he evaded
each one.  At one time approximately six or seven squad cars were involved in the
chase.  The chase ended on Jackson Street near the downtown area when the plaintiff
ran into a pickup truck driven by Third-Party Defendant Louis Landanskas, and
Defendant Pottebaum's car collided with a row of parked cars.   According to
witnesses' testimony, the plaintiff was "wrapped around a tree" and was believed to
be dead.  An ambulance was called for the plaintiff and Pottebaum, who laid
apparently unconscious in his car.  Several witnesses have testified that a citizen and
unnamed police officers attempted to aid the plaintiff, and an onlooker was quoted
as shouting to police, "To hell with the cop. Take care of that guy over there."

*Tagstrom v. Pottebaum*, 668 F. Supp. 1269, 1271 (N.D. Iowa 1987) (record citations omitted), *rev'd*
*sub nom. Tagstrom v. Enockson*, 857 F.2d 502 (8th Cir. 1988).

deliberate indifference claim asserted by plaintiff in the present action.

**C**.   *Failure to Intervene*

Even though plaintiff does not mention a "failure to intervene" claim in her complaint, she attempts to assert such a theory of recovery in her "Brief in Opposition to Thrower's and Baughman's Motions for Summary Judgment." *See* doc. no. 55, at 15 ("[P]olice cannot stand idly by while they witness Constitutional violations.") (citing *Byrd v. Clark*, 783 F.2d 1002 (11th Cir. 1986)).

The Eleventh Circuit has held that, "'[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation . . . takes place in his presence, the officer is directly liable under Section 1983.'" *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998) (quoting *Byrd*, 783 F.2d at 1007). A duty to intervene does *not* arise, however, unless there has been an underlying, constitutional violation requiring intervention. *See Crenshaw v. Lister*, 556 F.3d 1283, 1294 (11th Cir. 2009) (holding that a plaintiff's "failure to intervene" claim against one of two officers must fail because the first officer did not commit a constitutional violation). Here, this court has determined that Deputy Thrower did not commit a constitutional violation. Consequently, no duty to intervene arose, and plaintiff's belated assertion of a failure to intervene claim against Trooper Baughman is due to be dismissed as a matter of law.

# IV.  CONCLUSION

This is a terribly tragic case.  It is easy to understand the anguish of Jeffrey Ashley's family, and why they fail to comprehend the reason defendants chose to detain Jerry Ashley's automobile at Trooper Baughman's roadblock, as opposed to escorting or driving that vehicle to the intersection at which HEMSI's ambulance had been dispatched.  That is especially true for Jerry Ashley, who suffered the unspeakable agony of watching while bound in handcuffs his mentally-challenged, child-like brother "die . . . on the side of the road."[128]  By remaining at the roadblock, defendants worked a delay in Jeffrey Ashley's receipt of emergency medical attention.  How much better it would have been if, after perceiving his obviously serious and urgent medical needs, defendants only had reduced the time and distance to treatment by rushing eastward, and meeting HEMSI's ambulance at a place along Winchester Road, mid-way between Moores Mill and Riverton Roads.  As Jerry Ashley was recorded as saying to Deputy Thrower at 11:16:15 a.m., the

> [o]nly shot he [*Jeffrey*] had was meeting the ambulance *and you know that now*.
>
>      DEPUTY THROWER:  And we know that, yeah, but at the time we didn't.  And we don't do escorts, okay?
>
>      **. . . .**

---

[128] Joint Ex. 3-T at 30 (lines 9-11) ("I watched him die right here on the side of the road. Thank you.  Been like an infant all his life.").

UNIDENTIFIED MALE:  He would've still died.

JERRY ASHLEY:  Either way.  You got to think if that was your brother if you could have made it one more mile to the ambulance.[129]

In short, neither defendant conducted himself in a manner worthy of commendation.  Yet, as the Supreme Court has said (albeit, in a different context), when attempting to gauge the reasonableness of the actions of law enforcement officers, courts must make allowance for the fact that they "are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving."  *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

Moreover, this court is mindful of the fact that the joint decision of Mrs. Billie Green and the Ashley brothers to transport Jeffrey to Huntsville Hospital, rather than to the Lincoln County, Tennessee, Medical Center in Fayetteville, Tennessee, also worked a delay in his receipt of medical treatment.[130]  The driving distance from the Ashley home in Elora, Tennessee to the Lincoln County Medical Center is approximately 18 miles,[131] whereas Huntsville Hospital is about 28 miles from

---

[129] Doc. no. 61 ("Second Unopposed Supplemental Evidentiary Submission in Support of Defendant Casey Thrower's Motion for Summary Judgment"), Joint Ex. 3-T (transcript of the audible audio from the recording device mounted on the dash of Deputy Thrower's patrol vehicle), at 25 (lines 2-21) (electronically imprinted time notations omitted).

[130] See the text accompanying notes 20, 21, and 25 *supra*.

[131] *Compare* doc. no. 32 (Evidentiary Materials in Support of Deputy Thrower's Motion for Summary Judgment), Ex. A (Map showing road distance to be 18.2 miles, and driving time approximately 24 minutes) *with* http://www.mapquest.com (showing the driving distance between 407 Limestone Road in Elora, Tenn. 37328 and 106 Medical Center Blvd. in Fayetteville, Tenn. 37334 as18.10 miles, *and the driving time as 21 minutes*).  *See also* Ashley Depo. at 12 (admitting

Elora,[132] some ten miles farther.[133]  The delay caused by that fateful decision was far greater than the detention complained of in this action:  *i.e.*, Mapquest estimates the driving time from the Ashley home in Elora, Tennessee to the Lincoln County Medical Center as 21 minutes *versus* 41 minutes to Huntsville Hospital — a difference of 20 minutes.[134]

In summary, therefore, this case presents circumstances that are as tragic as they are unfortunate.  Jeffrey Ashley's family attempted to obtain the medical care he needed, but they were not able to do so in time to save his life.  Deputy Thrower and Trooper Baughman attempted to fulfill their duties to maintain safe roadways, while

---

that the Lincoln County Medical Center was closer to the Ashley home than Huntsville Hospital).

[132] *Compare* First Ashley Affidavit ¶ 4 ("The distance to the [Huntsville] hospital is 28 miles from my parent's [sic] house.") *with* http://www.mapquest.com (showing the driving distance between 407 Limestone Road in Elora, Tenn. 37328 and the entrance to Huntsville Hospital's Emergency Room on Madison Street, across from its intersection with Rands Avenue, as 27.29 miles, *and the driving time as 41 minutes*).  *See also* doc. no. 29 (Amended Complaint), at 2; doc. no. 52 (Brief in Support of Deputy Thrower's Motion for Summary Judgment), Statement of Facts ¶ 11.

[133] Despite the facts discussed in text, there apparently was no discussion between the Ashley brothers and Mrs. Green about driving Jeffrey to, or meeting an ambulance dispatched from, the nearest hospital, in Fayetteville.  After this suit was filed, that critical decision was explained two ways.  The first is found in Jerry Ashley's initial affidavit, where he said:  "This was the 2nd time that Jeff had what looked to me to be a heart attack.  *The first time I took him all the way to the Huntsville Hospital by myself without a problem and made it in about 30 minutes*."  First Ashley Affidavit ¶ 3 (emphasis supplied).  The second is found in Jerry Ashley's deposition, where he explained that "Jeff's medical care was always in Huntsville and . . . he couldn't speak, so we tried to make sure he got to the doctors [who] knew his case."  Ashley Depo. at 12.  That last explanation rings hollow, however, in view of the admission by plaintiff's counsel during oral argument that no telephone call was placed to Jeffrey's Huntsville physician(s), to alert them to the fact that he was en route to the hospital and ensure their presence upon his arrival.

[134] *See supra* notes 131 and 132.

also addressing Ashley's medical needs, but they too were unsuccessful in saving his life.  Everyone involved in the situation likely realizes, in hindsight, that additional steps could have been taken, and better choices could have been made.  Hindsight always is 20/20, but that is not the standard by which *constitutional* claims are measured.  As discussed earlier, § 1983 imposes liability only for violations of rights protected by the Constitution and federal statutes, "not for violations of duties of care arising out of tort law."  *Baker v. McCollan*, 443 U.S. 137, 146 (1979).

The *constitutionally* significant fact is that everyone, including the defendants, attempted to provide the medical assistance that Jeffrey Ashley required.  Defendants' ultimate lack of success in that endeavor, unaccompanied by any conduct rising above the level of gross negligence or a maddening lack of common sense, simply does not support a *constitutional* claim for deliberate indifference to Jeffrey Ashley's serious medical needs.

This court recognizes that such an outcome likely will provide no more comfort for the Ashley family's unimaginable loss than it provides satisfaction to the court. It is, nevertheless, the conclusion dictated by binding authorities.  Consequently, an order dismissing plaintiff's remaining claims will be entered contemporaneously herewith.

DONE this 30th day of November, 2009.

United States District Judge